METRO COMMUNICATION
CORP. BVI, Plaintiff,

v.

ADVANCED MOBILECOMM TECH-
NOLOGIES INC., Boston Ventures
Limited Partnership V, Manuel
Ceara, Donald S. Heaton, James P.
Hynes, Roy P. Coppedge, Neil A. Wal-
lack and Fidelity Ventures Brazil,
LLC., Defendants.

No. Civ.A. 20099.

Court of Chancery of Delaware,
New Castle County.

Submitted Feb. 2, 2004.
Decided April 30, 2004.
Revised May 3, 2004.

Norman M. Monhait, Rosenthal, Monhait, Gross & Goddess, P.A., Wilmington, Delaware; Frank C. Welzer, Zukerman Gore & Brandeis, LLP, New York, New York, for Plaintiff.

Jesse A. Finkelstein, and John D. Hendershot, Richards, Layton & Finger, P.A., Wilmington, Delaware; William F. Lee, Gabrielle R. Wolohojian, and Jonathan A. Shapiro, Hale and Dorr LLP, Boston, Massachusetts, for Defendants Advanced Mobilecomm Technologies Inc., Donald S. Heaton, Manuel Ceara, and James P. Hynes.

A. Gilchrist Sparks, III, Alan J. Stone, and Brian J. McTear, Morris, Nichols, Arsht & Tunnell, Wilmington, Delaware; Mark D. Cahill, Tricia A. Rice, and Jennifer Thibeault Connor, Choate, Hall & Stewart, Boston, Massachusetts, for Defendants Boston Ventures Limited Partnership V and Roy F. Coppedge.

Andre G. Bouchard, and Karen L. Pascale, Bouchard Margules & Friedlander, Wilmington, Delaware; James D. Smeallie, and Joshua C. Krumholz, Holland & Knight LLP, Boston, Massachusetts, for Defendants Fidelity Ventures Brazil, LLC and MetroRED Telecom Group Ltd.

STRINE, Vice Chancellor.

Metro Communication Corp., BVI ("Metro") is a former member of Fidelity Ventures Brazil, LLC ("Fidelity Brazil"), which was established by a limited liability company agreement in February 1998 (the "LLC Agreement") as the vehicle through which Metro and the other members of Fidelity Brazil would invest venture capital in the then-recently deregulated South American telecommunications market. By October 2000, Metro allegedly had invested approximately $31 million in Fidelity Brazil and affiliated entities, with an eye towards an IPO that would take advantage of the stratospheric valuations that similar

telecom firms were receiving at that time. These investments were made in the form of contractually contemplated capital calls that Metro and Fidelity Brazil's other investors were required to make upon request by Fidelity Brazil's managers.

Unfortunately for Metro, not only did the telecom bubble burst but it turned out (or so the amended complaint[1] alleges) that certain former employees of Fidelity Brazil were obtaining permits in Brazil through bribery sometime during 1998, a scandal that was ultimately revealed in the South American press in April 2000. The IPO plans were eventually abandoned and Metro's investment is now worth a fraction of what it once hoped.

Metro has thus brought this lawsuit, asserting a variety of claims against Fidelity Brazil and the other former members of that entity and its managers, as well as another related corporate entity. Stripped of its doctrinal complexities, Metro's basic theory is that all of the defendants either participated in the bribery or knew about it well before Metro did, and were not candid with Metro about either the bribery or the effect it was having on Fidelity Brazil's business. Metro claims that this conduct breached the LLC Agreement and the fiduciary duties of Fidelity Brazil's former managers. Having chosen to plead every conceivable claim that came to its lawyers' minds, Metro has also alleged claims of common law fraud and equitable fraud and that the defendants violated the Limited Liability Company Act (the "LLC Act") and the Fraudulent Conveyances Act. The defendants have moved to dismiss Metro's complaint in its entirety.

In this opinion, I conclude that Metro has stated a claim against Fidelity Brazil (and potentially its managers, under certain circumstances) for breach of the LLC Agreement. With respect to Metro's common law fraud claim, the majority of its allegations are insufficiently particularized to satisfy Rule 9(b) but Metro has sufficiently alleged that a series of Fidelity Brazil management reports that were "reviewed, adopted and approved" by Fidelity Brazil's managers and others before delivery to Metro in 1998 (the "1998 Management Reports") contained misleading statements. The 1998 Management Reports indicated that the process of obtaining permits in Brazil was going smoothly while in fact some of permits were being obtained through bribery. Metro allegedly relied on the completeness and accuracy of the 1998 Management Reports in continuing to invest capital in Fidelity Brazil. Therefore, as to those defendants who, from the allegations of the complaint, one can infer knew of the bribery at the time the 1998 Management Reports were delivered (because either they or their agents participated in it), the complaint states a claim for common law fraud.

As the opinion points out, the common law fraud claim is in many respects redundant of, and there is a good argument – which has not been made – that it should be deemed supplanted by, the context-specific common law standard of *Malone v. Brincat.*[2] The *Malone* standard applies when individuals on the governing board of a Delaware entity "knowingly disseminate false information that results in corporate injury or damage to an individual [owner]."[3] The *Malone* standard represents a policy choice by our Supreme Court regarding the standards by which to hold fiduciaries of entities responsible for misleading communications by the entities to

**1.** I hereafter refer to the amended complaint merely as the complaint.

**2.** 722 A.2d 5 (Del.1998).

**3.** *Id.* at 9.

their owners and logically, for reasons articulated herein, displaces the less context-specific standards reflected by ordinary principles of common law fraud. Under *Malone*, the complaint states a claim against those managers who knew of the bribery and who made misleading statements to Metro about the company's progress in securing necessary governmental permits. For obvious reasons, the complaint also pleads a fiduciary duty claim against those defendants who had knowledge of the bribery at the time of its occurrence. Under Delaware law, a fiduciary may not choose to manage an entity in an illegal fashion, even if the fiduciary believes that the illegal activity will result in profits for the entity.

By contrast, certain of the former managers who reviewed, adopted and approved the 1998 Management Reports cannot be deemed to have had knowledge of the bribery until early 1999, when all of the 1998 Management Reports had already been delivered. Because those defendants did not act with scienter during that period, the fiduciary duty claims against them under *Malone* for their disclosure-related conduct before they learned of the bribery will be dismissed. Because *Malone* is merely a context-specific application of traditional common law fraud principles, it is unsurprising that the absence of knowledge is also fatal to Metro's attempt to hold these defendants responsible for common law fraud for their actions in that period, regardless of whether *Malone* merely supplements, rather than supplants, common law fraud principles in this context.

That said, the complaint pleads that by early 1999, all of the defendants were aware of the bribery, which, in the unique circumstances of this case, supports a claim of breach of fiduciary duty under reasoning consistent with *Malone*. Despite knowing of the bribery, despite knowing that previous communications by Fidelity Brazil regarding the permitting process had omitted information regarding the bribery, and despite knowing that Fidelity Brazil had a contractual duty to disclose the existence of a possible material adverse effect ("MAE"), the defendants who were managers of Fidelity Brazil did not correct the earlier misleading communications to Metro even while continuing to make capital calls on Metro. These pled facts support additional claims for breach of fiduciary duty under *Malone* even against those managers who did not have contemporaneous knowledge of the bribery when the 1998 Management Reports were delivered because they suggest that those defendants knew a misleading impression had been created by previous communications they themselves had authorized, knew that evidence of an MAE existed, and consciously chose not to cause Fidelity Brazil to make the required MAE disclosure or to correct its earlier misleading statements even as they sought additional infusions of capital from Metro.

In so holding, I do not accept Metro's invitation to consider the demands for it to contribute capital as analogous to a request for stockholder action, as Metro was required to respond affirmatively to those demands in the absence of an excusing breach of the LLC Agreement or of fiduciary duty. Therefore, the more relaxed standard that governs fiduciary disclosure – a standard that requires the disclosure of all material facts and that does not require the plaintiff to show scienter – when fiduciaries request a unitholder tender or vote is inapplicable. Instead, the managers' fiduciary duties were defined by *Malone*, which requires pled facts supporting an inference that the defendants knowingly misled Metro in the 1998 Management Reports, and by the logical extension of *Malone* briefly outlined above, under

which the managers may be accountable for any knowing and bad-faith failure to correct the false impression that those Reports created once they learned of the bribery in the unique circumstances of this case.

In sum, I sustain Metro's fiduciary duty and common law fraud claims but the extent of those claims against particular defendants differs depending on when the defendants came to know about the bribery. In other words, my ruling critically hinges on the complaint's ability to plead scienter against the various defendants as to various time periods.

Relatedly, I conclude that Metro cannot assert equitable fraud claims against the former managers of Fidelity Brazil for communications made to Metro. As to these claims, the defendants argued that an equitable fraud claim cannot proceed to hold fiduciaries liable when the plaintiff cannot state a claim under *Malone. Malone* represents a policy choice regarding the level of culpability that ought to be shown when an individual on the governing board is subject to a claim for breach of fiduciary duty by an owner of the entity based on allegedly misleading statements at a time when the entity is not asking the stockholder to vote or tender. This distinction recognizes that unique policy concerns are involved in determining the extent to which a business fiduciary should be held responsible for misleading disclosures by the entity in a context when the fiduciary is not directly contracting with the owners of the entity and when the entity itself is not asking the owner for a vote or tender. Because equitable fraud does not require a plaintiff to prove scienter, allowing its use in this context would conflict with the policy choice made in *Malone,* a choice crafted in response to both the unique relationships between fiduciaries, entities, and their owners, and

the reality that the federal government pervasively regulates disclosure and securities fraud by business entities and their fiduciaries. The equitable fraud claims against the former fiduciaries of Fidelity Brazil are therefore dismissed.

The opinion also addresses a variety of other claims Metro makes, sustaining some of them and dismissing others.

## I. *Factual Background*

As alluded to and will become apparent shortly, Metro has taken great license in drafting its complaint, which is rife with conclusory allegations that do not withstand scrutiny even under the lenient pleading standards applicable on a motion to dismiss. The complaint's scattershot nature has made it difficult to distill its essence into a coherent narrative but what follows next is a good faith attempt to do just that. All of this recitation is drawn from the complaint and the implications of the reality that much of the complaint is cursorily pled are dealt with later in the opinion. For now, I simply attempt to outline the basic story as Metro presents it.

### The Formation And Ownership Structure Of Fidelity Brazil

Fidelity Brazil was formed by an LLC Agreement dated February 28, 1998, among Metro, Advanced MobileComm Technologies ("MobileComm"), and Boston Ventures Limited Partnership V ("Boston Ventures"). Through Fidelity Brazil, the parties to the LLC Agreement would make investments in the then-recently deregulated Latin American telecommunications industry, starting with the acquisition of MetroRED Telecomunicacoes Ltda. ("MetroRED Brazil"), which would focus on the Brazilian market.

Under the LLC Agreement, Mobile-Comm, which initially held 52% of Fidelity

Brazil's membership units, had the right to appoint four of Fidelity Brazil's seven managers. MobileComm is an indirect subsidiary of Fidelity Capital. Mobile-Comm was one of the four managers itself and acted through a designee, Lance Cawley. MobileComm also appointed Manuel Ceara, Donald Heaton, and James Hynes as managers. All of these individuals were employees within the Fidelity Capital family of companies.

Boston Ventures, which initially held 40% of Fidelity Brazil's membership units, had the right to appoint two managers, including itself. It appointed Roy Coppedge and, as designee for Boston Ventures, Neil Wallack.

I now mention an unusual fact. Plaintiff Metro, which held 8%, could appoint one manager, but chose not to exercise that right. In the complaint, Metro says that the defendants discouraged it from exercising its right to appoint a manager, indicating that it was unnecessary, as the other managers would represent the members' interests faithfully and skillfully. Practically speaking, Metro's failure to name a manager left it as a mere member and thus in a position, on this motion, to claim ignorance of a great deal of information that would have flowed to it had it exercised its contractual right to name a manager.

As a consequence of these various appointments, Fidelity Brazil allegedly had six managers during all relevant time periods. Four of them – Ceara, Coppedge, Hynes, and Heaton – were individuals who I refer to collectively as the "Individual Managers." The other managers were MobileComm and Boston Ventures, who were represented by Cawley and Wallack, respectively.

A description of how the ownership structure of Fidelity Brazil has changed since its formation will clarify some of the parties' respective claims in this case. In October 1998, MobileComm and Boston Ventures purportedly transferred their interests in Fidelity Brazil to MetroRED Telecom Ltd. ("MetroRED") in exchange for shares of MetroRED (the "1998 Reorganization"). MobileComm and Boston Ventures claim that as a result of the 1998 Reorganization, they ceased to be members of Fidelity Brazil, leaving only MetroRED and Metro as the sole members of that entity. Metro contests the validity of this transaction and alleges that in any event, following the 1998 Reorganization MobileComm and Boston Ventures "continued to hold themselves out as members of [Fidelity Brazil] and [Metro's] fiduciaries" and "continued in their roles as managers, and ... continued to control the business and operations of [Fidelity Brazil]."[4] For present purposes, the critical assumed fact is that MobileComm and Boston Ventures continued to serve as managers of Fidelity Brazil after the 1998 Reorganization.

The next reorganization of Fidelity Brazil occurred in October 2000, this time with Metro's participation (the "2000 Reorganization"). At that time, Metro assigned its 8% interest in Fidelity Brazil to MetroRED in exchange for approximately 10% of MetroRED's shares, and Fidelity Brazil transferred all its assets to MetroRED. Thereafter, Metro, Boston Ventures and MobileComm were all stockholders of MetroRED, which itself became the sole member of Fidelity Brazil. MetroRED then authorized the dissolution of Fidelity Brazil,[5] and a certificate of cancellation was

---

4. Am. Compl. ¶ 55.

5. Pl.'s Ans. Br. in Opp. To Mot. to Dismiss of Def. MetroRED Ex. D.

filed indicating that Fidelity Brazil had been dissolved and wound up.[6]

Metro allegedly began investing in Fidelity Brazil in March 1998. Its investments came in response to contractually required capital calls, which it made along with MobileComm and Boston Ventures (and presumably MetroRED, after the 1998 Reorganization, although the complaint is unclear on this point). By October 2000, Metro allegedly had contributed a total of approximately $31.5 million to Fidelity Brazil and MetroRED Telecomunicaciones SRL ("MetroRED Argentina"), an independent subsidiary of MetroRED investing in the Argentine telecommunications industry.[7] This was all in the hopes of being the "first-mover" in (what appeared at the time to be) the lucrative Latin American telecommunications market. Indeed, Metro alleges that in early 2000 MobileComm and its parent, Fidelity Capital, were projecting that MetroRED – the parent of MetroRED Argentina and entity to which all of Fidelity Brazil's assets were later transferred in the October 2000 Reorganization – would fetch a valuation of $1.2 billion in an IPO expected to occur later that year.[8]

Allegedly unbeknownst to Metro, however, a dirty not-so-little secret threatened to destroy all this expected value. According to Metro, during the period from in or before April 1998 to October 1998, certain Fidelity Brazil employees bribed local officials in order to obtain permits authorizing work in Brazil. Specifically, Metro alleges

that Cawley, Hynes and Heaton (all appointed as managers of Fidelity Brazil by MobileComm) and Jorge Vital (the first officer hired by Fidelity Brazil) participated in the bribery, which consisted of $2 million in payments from an account at Commercial Bank in New York to local officials in Sao Paolo. This illicit scheme first became public in April 2000, when news organizations reported that Overland Advisors, a consultant allegedly hired by or on behalf of Fidelity Brazil, made the improper payments – reportedly as part of a larger bribe of approximately $10 million – in order to obtain permits for Fidelity Brazil and MetroRED Brazil to build out a fiber optic network in Sao Paolo. Cawley, Hynes, Vital, and another Fidelity Brazil employee were implicated in the scandal and dismissed.[9]

According to Metro, this turn of events was shocking, as it starkly contrasted with the information that had been earlier conveyed to it. For example, Metro allegedly had received several management reports between July and December of 1998 – the previously mentioned "1998 Management Reports" – that addressed the process of obtaining permits and building networks in Sao Paolo and Brazil, but made no mention of the bribery scheme that was occurring at around that time.[10] The 1998 Management Reports were allegedly prepared by Cawley and MobileComm and "reviewed, adopted and approved" by various repre-

---

6. Pl.'s Ans. Br. in Opp. To Mot. to Dismiss of Def. MetroRED Ex. E.

7. Approximately $4.5 million of this total amount was allegedly invested in December 1996, and thus presumably was contributed to the Argentine entity. *See* Am. Compl. ¶¶ 32, 33. MetroComm seeks recovery of this amount as well. The relationship of the Argentine and Brazilian businesses is not made clear by the complaint.

8. *Id.* ¶ 52(b).

9. This is yet another respect in which the complaint is very unclear. It does not indicate who, if anyone, replaced Hynes on Fidelity Brazil's governing board and Cawley as MetroComm's designee after they were fired.

10. Am. Compl. ¶ 35.

sentatives of Fidelity Brazil and Boston Ventures.

Moreover, an email sent by Cawley to a Metro representative on or about August 5, 1998 (the "Cawley E–Mail") addressing the process of obtaining permits for "digging the streets" in Sao Paolo stated:

> I want to emphasize that there is no evidence of corruption, as one might suspect; nevertheless, we are continuing to monitor for this. Rather it appears that the people at the city are not competent to make a decision or incur any risk.... [W]e do have the "legal right" to dig the streets.[11]

The Cawley E–Mail also stated that although some "duct construction work" had been done "even though we had not obtained official permission," this was done on a "limited basis" and the "wors[t]" case would be that "MetroRED would not be allowed to use the ducts." The Cawley E–Mail and other communications from Metro apparently allayed Metro's fears, as it continued to invest substantial sums in Fidelity Brazil in 1999 and early 2000.

Thus, when the scandal first hit the press in 2000, Metro was understandably concerned and made inquiry of Mobile-Comm, Boston Ventures, and others. Metro's version of the events is that it was assured that "there was no cause for concern, that everything was under control, and that the business was continuing to develop as planned," [12] including the process of preparing for an IPO and other fundraising efforts. Not only were the effects of the scandal being downplayed to Metro, but Metro was also allegedly prevented from performing its own investigation, as certain individuals refused to allow Metro to contact local officers or to review corporate records.[13] Nonetheless, again apparently satisfied that things were under control, Metro invested nearly $11 million in Fidelity Brazil between May and October of 2000 [14] and continued to fail to exercise its right to appoint a manager to Fidelity Brazil's governing board.

Metro claims that other parties knew of the bribery well before the April 2000 news reports, but failed to disclose this information to Metro. Although most of Metro's allegations in this regard are conclusory and unsupported by specific factual details, Metro was able to obtain a document during jurisdictional discovery [15] that indicates that MetroRED officials were aware of the bribery at least since early 1999. A private placement memorandum for MetroRED dated March 2001 states:

> During early 1999, the Company brought to the attention of the U.S. Department of Justice information about activities that may have involved violations of the Foreign Corrupt Practices Act. In response to this information, the Department of Justice has been conducting an investigation with the full cooperation of the Company. The Company is also cooperating fully with civil and criminal investigations of these activities being conducted by Brazilian authorities. Based upon information available to date, the Company believes that the investigations will not have a negative

11. *Id.* ¶ 36.

12. *Id.* ¶ 52.

13. *Id.* ¶ 60.

14. *Id.* ¶ 33.

15. Initially, MetroRED moved to dismiss the claims against it for lack of personal jurisdiction. That motion was later withdrawn. I refer to this document because its significance was fully considered by the parties at oral argument. It is more efficient to do so; if I did not, I would feel obliged to allow an amendment to the complaint so that Metro could refer to this document.

long-range effect on the Company or its ability to serve its customers. The Company believes that any irregularities that may have occurred were the responsibility of individuals who are no longer employed by the Company or its subsidiaries.[16]

It is inferable that a decision to self-refer to the DOJ is not made lightly. Presumably, MetroRED would not have advised the DOJ of potential violations of federal criminal law without a serious discussion among its directors and high-level officers and the managers of Fidelity Brazil. Moreover, Metro has alleged that MetroRED was "owned and controlled" by MobileComm, Fidelity Capital, and Boston Ventures, "and acted through common officers and employees shared with [MobileComm] and [Boston Ventures], including Ceara, Heaton, Hynes … Coppedge and Wallack."[17] Although the complaint does not specifically say so, it is reasonable to infer that this intermingling of corporate executives began after the 1998 Reorganization, as MobileComm and Boston Ventures themselves contend that they acquired significant stakes in MetroRED at that time, and the complaint alleges that both of them "continued to control the business and operations of [Fidelity Brazil]" following the 1998 Reorganization.[18]

Thus, taking as true the allegations in the complaint, the statements in the private placement memorandum, and the admissions of MobileComm and Boston Ventures, Metro has sufficiently alleged that all of the defendants – MetroRED, MobileComm, Boston Ventures, Fidelity Brazil and the Individual Managers – have known of the DOJ self-reference (and therefore of the bribery) at least since early 1999. But, this information was allegedly never disclosed to Metro, even during later meetings in 1999, in which high-level representatives from Fidelity Brazil and MobileComm allegedly advised Metro that while there were unexplained "activities of concern" in MetroRED Brazil, those matters had been investigated and had "no effect on the business."[19]

16. Pl.'s Ans. Br. in Opp. To Mot. to Dismiss of Def. MetroRED Ex. J.

17. Am. Compl. ¶ 55.

18. *Id.* Other allegations support this inference. For example, the complaint alleges that the DOJ self-reference was made by "representatives of [MobileComm] and its parent Fidelity [Capital]," *id.* ¶ 38, while the document described above states that it was MetroRED that made the self-reference, indicating that Metro understood the same individuals in charge at MetroRED to be at the helm at MobileComm as well. Moreover, another document produced during jurisdictional discovery indicated that the directors of MetroRED Telecom Ltd. in March 1998 were Hynes, Hilton, Cawley and Heaton. Pl.'s Ans. Br. in Opp. To Mot. to Dismiss of Def. MetroRED Ex. I. There was some confusion at oral argument over whether this particular entity is distinct from MetroRED Telecom Group Ltd., which is the actual defendant in this action. In any event, the complaint alleges that MetroRED Telecom Ltd. is simply the former name of defendant MetroRED, *see* Am. Compl. ¶ 6, an allegation that is supported by documents that MetroRED itself produced during discovery, *see* Pl.'s Ans. Br. in Opp. to Mot. to Dismiss of Def. MetroRED Ex. G at 4 (MetroRED's written response to plaintiff's Rule 30(b)(6) deposition notice stating that "MetroRED Telecom Ltd.'s name was changed to MetroRED Telecom Group Ltd." and that "no changes of officers, directors, agents or employees occurred as a result of the name change").

Of course, the mere fact that MetroRED, Fidelity Brazil, MobileComm and Boston Ventures allegedly had overlapping officers, directors and managers, does not in itself establish an agency relationship between any of those entities or indicate that their separate corporate existences should be disregarded for purposes of any of Metro's claims.

19. *E.g.*, Am. Compl. ¶¶ 41, 42(a)-(b)

According to the complaint, it was only in 2002 that Metro learned the full impact of the previous scandal. In addition to the DOJ self-reference, Metro alleges that other official actions had been taken,[20] and that government officials and clients became reluctant to deal with MetroRED because of the scandal's impact. Potential investors refused to participate in financing rounds, and IPO plans were scuttled. A competitor, NetStream, replaced MetroRED as the leading player in the Latin American telecom market and was later sold to AT & T for $300 million. MetroRED Brazil, by contrast, was recently sold for a price allegedly substantially lower than it would have been had the scandal not occurred, while MetroRED Argentina defaulted on a bank loan and filed for bankruptcy in May 2002.

### Metro's Complaint And Its Various Claims

Metro has thus brought this lawsuit, seeking recovery from Fidelity Brazil and the "Individual Managers" – i.e., Ceara, Heaton, Hynes, and Coppedge – as well as MobileComm, Boston Ventures, and MetroRED. Metro's basic theory is that each of the defendants either participated in the bribery, or at least knew about it well before Metro did. Moreover, they also allegedly knew of the severity of the consequences of the scandal – e.g., government investigations, tarnished investor relations, and the virtual impossibility of a successful IPO – but never informed Metro of these facts and, indeed, actively concealed and misrepresented (whether intentionally or otherwise) the true state of affairs. Metro, in reasonable reliance on the good faith of all the defendants, was

therefore duped into continuing to pour capital into Fidelity Brazil, while the defendants attempted to extricate themselves from the deepening morass first by purporting to interpose MetroRED between themselves and Fidelity Brazil in the 1998 Reorganization, and then by causing Fidelity Brazil to dissolve after transferring its assets "offshore" to MetroRED, a Bermuda company, in the 2000 Reorganization. Metro thus seeks, among other things, recovery of its entire $31.5 million investment as well as the further "consequential" damages of lost business opportunities such as the value of an unconsummated IPO, which Metro believes to "exceed $95 million."

The complaint contains six counts, alleging breach of contract, breach of fiduciary duty, fraud, equitable fraud, and statutory claims under the LLC Act and Fraudulent Conveyances Act. Regrettably, Metro has chosen to throw a large pie with the works at every one of the defendants, leaving the court to determine what justly sticks to the various defendants and to clean the rest off the floor. That is, the complaint generally asserts each of these claims against most or all of the defendants without regard to whether there is any factual or legal basis for doing so.

Like the court, the defendants faced the difficult challenge of responding to the unwieldy complaint and trying to address the myriad of theories of recovery Metro articulates. They did so by filing a motion to dismiss for failure to state a claim. At oral argument, the defendants candidly conceded that they doubted they could obtain dismissal of all counts in the complaint but hoped to at least pare the case down to

---

**20.** Metro also alleges that in January 2000 the FBI raided the offices of Overland Advisory and found evidence of an "international bribery scheme" involving some of the defendants or their agents, and that sometime in 2000, a grand jury in New York allegedly began investigating the improper payments under the Foreign Corrupt Practices Act. MetroRED was also allegedly fined for illegal building of unregistered networks.

a manageable and well-pled group of claims, which would provide a focus for the procession of the case in an orderly and understandable manner.

What follows next is the court's analysis of their motion.

## II. *Legal Analysis*

"In considering a Rule 12(b)(6) motion to dismiss, the Court must assume the truthfulness of all well-pleaded facts contained in the complaint, view those facts and all reasonable inferences drawn therefrom in the light most favorable to the plaintiff, and determine with 'reasonable certainty' whether the plaintiff would be entitled to relief under any set of facts that could be proven. Conclusory allegations unsupported by facts contained in a complaint, however, will not be accepted as true." [21]

### *Breach Of Contract*

Metro has asserted breach of contract claims against Fidelity Brazil, Boston Ventures, and MobileComm (but not against any of the Individual Managers, presumably because they are not parties to the LLC Agreement) based on both express provisions of the LLC Agreement as well as implied contractual duties that those defendants assertedly owe Metro. The primary provision on which Metro relies is § 5(e) of that Agreement, which provides:

*Other Information:* The Company [Fidelity Brazil] shall deliver to each Member, promptly after the occurrence thereof, written notice and a description of any event, including any litigation, which could reasonably be expected to have a material adverse effect upon the Company, its financial condition, results of operations, prospects or business.

Metro argues that the bribery plainly triggered Fidelity Brazil's duty under § 5(e) to provide written notice to the members, including Metro, as that "event" is one that "could reasonably be expected to have a material adverse effect upon the Company." Moreover, Fidelity Brazil officials – namely Cawley, Hynes, Heaton and Vital – allegedly participated in the bribery, so Fidelity Brazil could hardly claim ignorance of the event. Thus, taking the allegations in the complaint as true, Fidelity Brazil was obligated to inform Metro of the bribery at the time it occurred, but it failed to do so, in violation of § 5(e).

■ The difficulty Metro faces is that Fidelity Brazil no longer exists – the company was dissolved, and its certificate of cancellation was filed, with Metro's knowledge and participation in the 2000 Reorganization. As Fidelity Brazil points out, absent statutory authority, no claim may be brought against a dissolved entity.[22] Moreover, § 18–803(b) of the LLC Act provides that suit generally may be brought by or against a limited liability company only until the certificate of cancellation is filed.[23] But, Metro has explicit-

---

21. *Orman v. Cullman*, 794 A.2d 5, 15 (Del.Ch. 2002) (footnotes omitted).

22. *See In re Citadel Indus., Inc.*, 423 A.2d 500, 503 (Del.Ch.1980) ("At common law, the dissolution of a corporation abruptly ended its existence, thus abating all pending actions by and against it and terminating its capacity thereafter to sue or be sued. Thus, statutory authority is necessary to prolong the life of a corporation past its date of dissolution."); *Int'l Pulp Equip. Co. v. St. Regis Kraft Co.*, 54 F.Supp. 745, 748 (D.Del.1944) ("[A]t common law a dissolved corporation could neither sue nor be sued.").

23. 6 *Del. C.* § 18–803(b) provides:

Upon dissolution of a limited liability company and *until the filing of a certificate of cancellation* as provided in § 18–203 of this title, *the persons winding up the limited liability company's affairs may, in the name of, and for and on behalf of, the limited liability company, prosecute and defend suits,* whether civil, criminal or administrative, gradual-

ly sought to have the certificate of cancellation nullified on the ground that Fidelity Brazil's affairs were not "wound up in compliance" with the LLC Act.[24] Specifically, 6 *Del. C.* § 18–804(b)(3) provides:

A limited liability company which has dissolved . . . [s]hall make such provision as will be reasonably likely to be sufficient to provide compensation for claims that have not been made known to the limited liability company or that have not arisen but that, based on facts known to the limited liability company, are likely to arise or to become known to the limited liability company within 10 years after the date of dissolution.[25]

 Here, Metro argues that "based on facts known to" Fidelity Brazil (through its employees, Cawley, Hynes, Heaton and Vital), Metro's claim for breach of the LLC Agreement was "likely to arise or to become known to [Fidelity Brazil] within

10 years after the date of dissolution," and yet Fidelity Brazil failed to "make such provision as will be reasonably likely to be sufficient to provide compensation" for that claim, in violation of 6 *Del. C.* § 18–804(b)(3). The fact that Metro participated in the dissolution after learning about the bribery in the press does not alter this conclusion; given the failures in disclosure alleged in the complaint, the fact that Metro "participated" in the 2000 Reorganization does not necessarily mean it knowingly waived or otherwise compromised any claim it might have had against Fidelity Brazil for breaches of the LLC Agreement that may have occurred before the 2000 Reorganization.[26] Thus, because the complaint pleads facts that support the inference that Fidelity Brazil was wound up in contravention of the LLC Act, the complaint also pleads facts that support an application to nullify the certificate of cancellation.[27] As a consequence, Fidelity

ly settle and close the limited liability company's business, dispose of and convey the limited liability company's property, discharge or make reasonable provision for the limited liability company's liabilities, and distribute to the members any remaining assets of the limited liability company, all without affecting the liability of members and managers and without imposing liability on a liquidating trustee.
*Id.* (emphasis added).

**24.** *See In re CC & F Fox Hill Assocs. Ltd. P'ship*, 1997 WL 349236, at *4 (Del.Ch. June 13, 1997) (nullifying certificate of cancellation in part because affairs of limited partnership were not "wound up in compliance with" 6 *Del. C.* § 17–804). Although *CC & F Fox Hill Assocs.* concerned a limited partnership rather than a limited liability company, both Fidelity Brazil and Metro have agreed that the applicable principles are identical for purposes of determining whether Metro may sue Fidelity Brazil after dissolution.

**25.** 6 *Del. C.* § 18–804(b)(3).

**26.** For example, the April 2000 news reports presumably made no mention of the fact that MetroRED made a self-reference to the DOJ

in early 1999, even though that fact arguably constituted an MAE that Fidelity Brazil was required to disclose under § 5(e). Had Metro know that its fiduciaries knew of the bribery over a year before it did, it might not have been willing to allow Fidelity Brazil to be dissolved without making some reserves for its potential claims.

**27.** Fidelity Brazil concedes that under *CC & F Fox Hill Associates* a certificate of cancellation can be nullified, but suggests that Metro was required to bring a separate action seeking to nullify Fidelity Brazil's certificate of cancellation *before* it could bring this action. I see nothing in *CC & F Fox Hill Associates* or the relevant statute that would support such a requirement, which makes little sense as a matter of efficiency.

Moreover, *In re Citadel Industries, Inc.*, 423 A.2d 500 (Del.Ch.1980), is inapposite. That case merely held that the court could not continue the existence of a corporation under 8 *Del. C.* § 278 so as to permit a suit against the corporation that was instituted outside the statutory three-year period following its dissolution. 8 *Del. C.* §§ 280–82, which govern the steps dissolving corporations must take to

Brazil's motion to dismiss Metro's claim for breach of § 5(e) of the LLC Agreement is denied.

■ Metro has also stated a valid claim against Fidelity Brazil under § 5(f) of the LLC Agreement, which provides:

*Inspection Rights.* The Company shall permit representatives of each Member to examine and make copies of its records and books of account, to inspect its properties, to discuss its affairs with its officers, Managers and independent accountants, and to make recommendations regarding the conduct of the Company's business and affairs.

The complaint contains several allegations which, while vague, describe specific instances in which Metro was denied access to corporate information and prohibited from contacting Fidelity Brazil executives.[28] These allegations are sufficient to state a claim against Fidelity Brazil for breach of § 5(f) under notice pleading standards.

■ I also find that the complaint states another potentially viable contract claim against MobileComm and Boston Ventures, which were parties to the LLC Agreement and were allegedly managers of Fidelity Brazil who knowingly caused Fidelity Brazil to violate §§ 5(e) and 5(f). MobileComm and Boston Ventures argue that this contract theory lacks force because §§ 5(e) and (f) only mention the company, i.e., Fidelity Brazil, and not the managers. The problem with that argument is that the introductory clause to § 5 states that "[e]xcept as otherwise specifically provided herein ... the Company and each Member and Manager will comply with the covenants set forth in this Section 5."[29] This is very oddly written provision that I find is not susceptible to only one reading. One of the readings that may be given to that language is that it requires managers to refrain from knowingly managing Fidelity Brazil in a manner that would breach a covenant in § 5 unless some exception to the covenant applied. In this instance, I am unable at this stage to conclude that a knowing decision by a manager of Fidelity Brazil to cause the company to violate §§ 5(e) and (f) could not, given the express terms of the introduction to § 5, also constitute a breach of contract by that manager.[30] This, at the

---

provide for foreseeable future, yet unknown claimants of the dissolved corporation, were first enacted in their present form in 1987, after *In re Citadel Industries, Inc.* was decided, and therefore that case did not address a claim seeking to nullify a certificate of dissolution because the corporation was not wound up in accordance with the relevant statute.

**28.** *See* Am. Compl. ¶¶ 44, 45, 60.

**29.** LLC Agreement § 5.

**30.** MobileComm and Boston Ventures contend that they cannot be held personally liable under the LLC Agreement because § 6 of that Agreement provides that no "Member or Manager [shall] be personally liable for any liabilities or obligations of the Company," and because *6 Del. C.* § 18–303(a) provides that "no member or manager of a limited liability company shall be obligated personally for [the] debt[s], obligation[s] or liability[ies] of the limited liability company solely by reason of being a member or acting as a manager of the limited liability company." That argument is unavailing, both because § 6 of the LLC Agreement can be reasonably read to refer to obligations owed by Fidelity Brazil to third parties rather than obligations owed to members under the LLC Agreement itself – and indeed § 18–303 is expressly titled "Liability to 3rd Parties" – and because the introductory clause to § 5 can be read to directly impose obligations on those defendants as managers.

I also reject MobileComm and Boston Ventures' argument that they were relieved of any contractual obligations under the LLC Agreement when they purportedly transferred their interests in Fidelity Brazil to MetroRED in the 1998 Reorganization. To the extent

very least, is one reasonable reading of the LLC Agreement.[31]

My indulgence of this unusual claim, however, reads the term "comply" as incorporating a knowledge requirement in the sense that the manager would only be culpable (i.e, would only fail to comply with a covenant) if he, she or it knew that Fidelity Brazil was taking action inconsistent with a covenant in § 5 of the LLC Agreement and if the manager did not act to ensure compliance with the relevant covenant. Thus, the contract claim against MobileComm may proceed from the time it is alleged to have known of the bribery scheme (1998) and against Boston Ventures as of the time it possessed such knowledge (early 1999).

The import of recognizing this possible avenue of recovery is not clear to me for reasons relating to other claims pled in the complaint. As a practical matter, the defendants' contractual argument ignores the implications that the specific terms of the LLC Agreement have on the managers' fiduciary duties. Obviously, one of an LLC manager's duties is to govern the LLC in accordance with the LLC Agreement. If an LLC manager knowingly permitted the LLC to violate a contractual duty owed to one of the company's members, that would, as I find later, constitute a breach of fiduciary duty.[32] The introduc-

that the complaint adequately alleges that those defendants remained managers, they are potentially still subject to § 5 notwithstanding any purported transfer of their interests. Even the very document which supposedly accomplished that transfer – a document not incorporated into the complaint – merely states that the schedule to the LLC Agreement detailing MobileComm and Boston Ventures' membership interests is "deleted in its entirety" but does not explicitly relieve those entities of their obligations under the LLC Agreement, instead stating that "[e]xcept as specifically amended hereby, the Agreement remains in full force and effect." MobileComm Opening Br. Ex. 1. That document is therefore susceptible to the reading that it did not relieve those defendants of their obligations as managers and parties to the original LLC Agreement under § 5.

31. I reject the defendants' contention that this is an unreasonable reading because it makes certain of the covenants in § 5 redundant, for example by requiring the members to report to themselves under § 5(e), and because certain of the covenants specifically mention both the "Company" and its "Managers" and/or "Members." Plainly the reading described above, which would require the managers who are parties to the LLC Agreement not to knowingly cause Fidelity Brazil to violate its duties under the Agreement, would not require the managers to superfluously perform duties that Fidelity Brazil had already performed. Nor would it be inconsistent for the managers to both ensure Fidelity Brazil's

compliance with its obligations as well as perform certain contractual obligations directly imposed on them.

32. Metro has argued that the defendants are liable for breach of contract because they have an implied duty of good faith and fair dealing that was breached by their failure to ensure that Fidelity Brazil honored the LLC Agreement. This argument is not persuasive. If § 5's introduction makes managers directly liable, then there is no room for the implied covenant to apply. See USX Corp. v. Prime Leasing Inc., 988 F.2d 433, 439 (3d Cir.1993) (a party "cannot assert a claim for breach of implied covenants [of good faith and fair dealing] that is based on exactly the same acts which are said to be in breach of express covenants"). If, by contrast, § 5 does not have that effect, then by their own terms §§ 5(e) and 5(f) never mention managers. This distinction would have to be seen as intentional and as precluding the application of any contractual theory of recovery. See Chamison v. HealthTrust, Inc. – The Hospital Co., 735 A.2d 912, 921 (Del.Ch.1999) ("The implied covenant [of good faith and fair dealing] cannot contravene the parties' express agreement and cannot be used to forge a new agreement beyond the scope of the written contract."), aff'd, 748 A.2d 407 (Del.2000) (TABLE); Kelly v. McKesson HBOC, Inc., 2002 WL 88939, at *10 (Del.Super.Jan.17, 2002) ("[T]he Court will not readily imply a contractual obligation where the contract expressly addresses the subject of the alleged

tion to § 5 can be thought to make this duty an explicit obligation of persons who accept a manager's role at Fidelity Brazil.

■ Finally, without burdening the reader with a lengthy explanation of why, Metro's arguments that provisions in the LLC Agreement other than §§ 5(e) and (f) have been breached lack merit.[33] Nor did the defendants breach any implied contractual duty by allegedly "operating Fidelity Brazil in an illegal manner." While it is presumably true that all parties entering into a long-term contractual relationship in some sense assume that the other parties will conduct themselves in accordance with the positive law, that is just another way of stating the expectation that fiduciaries who operate entities will not knowingly cause the entities to breach the law in conducting their business. The public policy purpose

that would be served by replicating that recognized fiduciary duty as a contractual duty inherent in every LLC agreement seems minimal to me, given my understanding that this fiduciary principle cannot be contracted away by private parties, since it involves an important public interest.

### Metro's Disclosure Claims

The heart of Metro's complaint revolves around the claim that it was not sufficiently informed about the bribery scandal and its consequences until it had already responded affirmatively to numerous capital calls and thereby poured millions of additional dollars into Fidelity Brazil. This factual core forms the basis of three distinct disclosure-based legal theories that

wrong, yet does not provide for the obligation that is claimed to arise by implication."). In my view, however, that reality cannot be bootstrapped into a preclusion of the operation of fiduciary duty principles. Even if § 5 applied only to Fidelity Brazil, the proposition that the managers of an LLC have no fiduciary duty *at all* to ensure that the LLC lives up to its contractual duties is one that is difficult to accept and that is certainly not supported by prior precedent. How can an LLC perform a contract except through its managers and officers?

**33.** Specifically, Metro argues that three other specific contractual provisions were violated. First, Metro cites § 25, which imposes a duty on members not to "materially interfere with the business relationship of company." That provision plainly is a noncompete obligation and has no relevance to the present dispute. Second, Metro argues that the defendants violated § 5(p), which obligates Fidelity Brazil and its members not to "enter into any agreement or contract that conflicts with its obligations under" the LLC Agreement, by allegedly entering into "agreements to bribe" or "agreements not to disclose the bribery to Metro." This provision – which is intended to address matters such as usurpation of corporate opportunities – could be breached only if Metro proved that these purported "agree-

ments" conflicted with some other contractual obligation owed by the defendants, and does not provide an independent basis for contractual liability. Finally, § 2 of the LLC Agreement, which states that the business of Fidelity Brazil is to engage in such activities as are "permitted" for a Delaware LLC, does not aid Metro. While it is inarguably true that bribery is not "permitted," Metro has not identified a single case suggesting that the company – which is operated through its managers and officers – is itself liable to its owners when those managers or officers cause it to operate illegally. While that illegal activity might support an action for breach of fiduciary duty against the manager or officer by the owners, any such action would be in the form of a derivative claim on behalf of the entity injured by its manager's or officer's fiduciary breach. For this reason, I am reluctant to set a precedent that a standard contractual provision can create a contractual cause of action by owners against a company when its managers or officers cause it to engage in illegal activity.

Moreover, I note that, for obvious reasons, I will not consider Metro's argument, raised in a footnote in its brief but nowhere in its complaint, that the defendants committed additional contractual breaches. Pl.'s Ans. Br. in Opp. to Defs.' Mot. to Dismiss, at 22 n. 22.

Metro has advanced in an effort to recoup those sums.

First, Metro pleads common law fraud claims against all the defendants alleging that each of them knowingly or recklessly made false statements to Metro with the intent to induce Metro to continue to contribute capital, and that Metro reasonably relied on those statements to its detriment. Metro also bases its fraud claims on the defendants' alleged active concealment or nondisclosure of material information to Metro.

Second, Metro asserts equitable fraud claims against all the defendants, arguing that they are susceptible to liability even if they did not know that certain statements made to Metro were false.

Third, Metro has asserted fiduciary duty claims against the former managers of Fidelity Brazil – i.e., the Individual Managers, MobileComm (which served as manager through its designee Cawley), and Boston Ventures (whose manager-designee was Wallack). Among other arguments, Metro claims that those defendants breached their fiduciary duty to disclose by failing to disclose certain information when making capital calls upon Metro, and breached their fiduciary duty of loyalty by misrepresenting certain facts to Metro.

I now turn to address each of these three claims. Initially, I will address Metro's common law fraud claims. I do this first because it is important to keep in mind the basic elements of common law fraud in order to put in context the remaining disclosure issues, which pose an interesting policy issue regarding the extent to which the standards that govern the disclosure obligations of entity fiduciaries to entity owners ought to be viewed as supplanting, rather than supplementing,

common law and equitable fraud theories of recovery. In particular, this case poses the question of whether an equitable fraud theory may be advanced against fiduciaries when the standard of *Malone v. Brincat* governs their exposure to liability for breach of fiduciary duty. For reasons related to this relationship, I address some of the fiduciary duty theories concurrently with addressing Metro's equitable fraud claim.

### Common Law Fraud

■ For Metro to state common law fraud claims against the defendants in this context, it must plead several well-understood elements. In order to state a claim of common law fraud against any particular defendant, Metro must allege – with the particularity required by Rule 9(b) – that that defendant either 1) represented false statements as true, 2) actively concealed facts which prevented Metro from discovering them, or 3) remained silent in the face of a duty to speak.[34]

■ Metro has alleged each of these three types of common law fraud against all the defendants. In assessing Metro's common law fraud claims, two significant factors bear noting. First, "all three types of fraud require a certain level of scienter on the part of the defendant; a misrepresentation must be made either knowingly, intentionally, or with reckless indifference to the truth."[35] Second, Metro has already amended its original complaint in response to the defendants' first motion to dismiss, which was based in part on their argument that the original complaint failed to comply with Rule 9(b). Metro was therefore clearly on notice that it if it wished to plead a claim of fraud, it would

---

**34.** *Stephenson v. Capano Dev., Inc.,* 462 A.2d 1069, 1074 (Del.1983).

**35.** *DRR, L.L.C. v. Sears, Roebuck & Co.,* 949 F.Supp. 1132, 1137 (D.Del.1996).

have to plead particularized facts supporting that claim in its amended complaint.

 Rule 9(b) provides that "[i]n all averments of fraud ... the circumstances constituting fraud ... shall be stated with particularity." [36] The requirements of the particularity standard are well established: "The circumstances which shall be stated with particularity in Rule 9(b) refer to the time, place and contents of the false representations, the facts misrepresented, as well as the identity of the person making the misrepresentation and what he obtained thereby." [37] While the Rule permits "intent, knowledge and other condition of mind of a person" to be averred generally, "[t]o say 'Defendant knew or should have known' is not adequate." [38]

 Under these standards, I must disregard conclusory allegations unsubstantiated by specific factual details that would support a rational inference that a particular defendant committed common law fraud. Thus, as just one example, I cannot credit Metro's allegation in ¶ 42 of the complaint that, after it received a letter in June 1999 regarding "activities of concern" in MetroRED Brazil that had been investigated, Metro "was assured by various representatives of [Fidelity Brazil], its members and managers that there was no cause for concern and that [Fidelity Brazil's] business was continuing to develop according to plans." [39] Among other deficiencies, this particular allegation does not even purport to identify any specific statement by a specific defendant at a specific time. While the complaint goes on to allege in ¶¶ 42(a)-(c) certain facts that might tend to support the conclusory assertions in ¶ 42, and I will evaluate the sufficiency of ¶¶ 42(a)-(c) below, Rule 9(b) requires that I give no credence to the allegations in ¶ 42 itself and similarly inadequate statements scattered throughout the complaint. With these standards in mind, I now turn to address each of Metro's fraud claims.

### Overt Misrepresentation

 To prove its claim that a defendant committed fraud by overt misrepresentation, Metro must show:

1) a false representation, usually one of fact, made by the defendant;

2) the defendant's knowledge or belief that the representation was false, or was made with reckless indifference to the truth;

3) an intent to induce the plaintiff to act or to refrain from acting;

4) the plaintiff's action or inaction taken in justifiable reliance upon the representation; and

5) damage to the plaintiff as a result of such reliance. [40]

 The main allegations that come close to satisfying Rule 9(b) involve statements in the 1998 Management Reports. The 1998 Management Reports included specific statements regarding "applications for digging permits [that] were submitted to ... municipality authorities," [41] and reported that "[w]e are making efforts to obtain the permit [in Sao Paolo] by the end

36. Ct. Ch. R. 9(b).

37. *York Linings v. Roach*, 1999 WL 608850, at *2 (Del.Ch. July 28, 1999) (internal quotations and citations omitted).

38. *Twin Coach Co. v. Chance Vought Aircraft, Inc.*, 163 A.2d 278, 284 (Del.Super.1960).

39. Am. Compl. ¶ 42.

40. *Stephenson v. Capano Dev., Inc.*, 462 A.2d 1069, 1074 (Del.1983).

41. Am. Compl. ¶ 35(a).

of July." [42] Assuming the truth of the allegations in the complaint, those statements were misleading because they described the permitting process without indicating that some of the permits were being obtained through bribery at the very same time the 1998 Management Reports were being delivered to Metro. The complaint also identifies specific dates on which Metro received the 1998 Management Reports, and states that they were "prepared by Cawley and [MobileComm]" and "were each reviewed, adopted and approved by Vital, Ceara, Heaton, Hynes, [Boston Ventures], Coppedge and Wallack." [43] These allegations are sufficiently specific to ascribe the misleading statements in the 1998 Management Reports to all of those parties, as well as Fidelity Brazil itself.[44]

Although the complaint adequately alleges that each of these defendants authorized the statements, it does not adequately allege that each of them had knowledge of the misleading nature of those statements -- i.e., the omission of the pattern of bribery. Rather, the complaint only pleads facts that create an inference of contemporaneous knowledge that the 1998 Management Reports were materially misleading on the part of defendants Hynes, Heaton, MobileComm (through its agent Cawley) and Fidelity Brazil. The complaint pleads facts that support the inference that each of these defendants (or their agents) participated in the bribery scheme. Additionally, the complaint alleges that all of the defendants benefited by making the statements indicating that the permitting process was proceeding smoothly because they induced Metro to contribute additional capital, which purportedly gave the defendants breathing room to perform some crisis management regarding the bribery scandal and allowed some of the Individual Managers to continue to receive compensation for their positions at Fidelity Brazil.[45] I also conclude that Metro had adequately alleged reasonable reliance.[46]

42. *Id.* ¶ 35(b).

43. *Id.* ¶ 35.

44. Metro's claim of fraud, while based on statements in the 1998 Management Reports, is also asserted directly against the individuals and entities who were its managers, on the theory that they were "actual participants" in the fraud. *See St. James Recreation, LLC v. Rieger Opportunity Partners, LLC*, 2003 WL 22659875, at *8 (Del.Ch. Nov.5, 2003) (stating that to hold corporate officer personally liable for fraud, plaintiff must demonstrate that officer was "actual participant" in fraud by showing, among other things, that officer "was responsible for the delivery of the written material" containing the misrepresentations); 3A William Meade Fletcher et al., Fletcher Cyclopedia of the Law of Private Corporations § 1135 (perm.ed., rev.vol.2002) ("[M]ore than mere knowledge may be required in order to hold an officer liable. The plaintiff must show some form of participation by the officer in the tort, or at least show that the officer directed, controlled, approved, or ratified the decision which led to the plaintiff's injury.").

Notably, the complaint does not allege that MetroRED "reviewed, adopted and approved" the 1998 Management Reports, nor does it allege that any of the individuals who are identified as having played a role in their preparation were acting as agents of MetroRED at that time. While the fax cover page for one the management reports allegedly indicated that it was from "MetroRED Argentina," Am. Compl. ¶ 35(a), which was a subsidiary of MetroRED, this is insufficient to attribute that management report to MetroRED itself. Thus, the statements in the 1998 Management Reports cannot be attributed to MetroRED.

45. Am. Compl. ¶ 66.

46. The defendants' insistence that Metro had contractually committed itself in the LLC Agreement to respond to capital calls whenever they were made is overstated. Metro did not bind itself to contribute good money after bad while the company's executives engaged

Thus, to summarize, Metro has alleged, with the particularity required by Rule 9(b), that Fidelity Brazil, Mobile-Comm, Heaton and Hynes 1) made misleading statements in 1998 Management Reports regarding the permitting process; 2) knowing that those statements were misleading because they failed to disclose the bribery of which they were aware; 3) with the intent to induce Metro to continue to invest capital in Fidelity Brazil; [47] and that 4) Metro justifiably relied on the accuracy and completeness of the 1998 Management Reports in contributing funds to Fidelity Brazil; and 5) has suffered damages as a result. Metro has therefore stated a claim of common law fraud against Hynes, Heaton, MobileComm, and Fidelity Brazil.[48]

But, there are no specific factual allegations from which one could reasonably infer that Boston Ventures, Ceara, or Coppedge had actual knowledge of the bribery when the 1998 Management Re-

in possible violations of Brazilian law and the Foreign Corrupt Practices Act. Metro might have been excused from its contractual obligation to respond to capital calls upon the managers' request if those managers had committed a prior, material breach of their duties to it. *Cf. Rohe v. Reliance Training Network, Inc.*, 2000 WL 1038190, at *16 n. 50 (Del.Ch. July 21, 2000) (stating that an agreement to vote for a director could be excused if the director later engaged in material misconduct justifying removal). Moreover, had Metro learned of the misconduct, it could have sought judicial dissolution of Fidelity Brazil on the ground that it was "not reasonably practicable to carry on the business in conformity with [the] limited liability company agreement." 6 *Del. C.* § 18–802.

47. The defendants suggest that the 1998 Management Reports were merely intended to update Metro on the status of the business rather than to induce Metro to comply with capital calls. Because Fidelity Brazil, MobileComm, Heaton and Hynes are deemed to have had contemporaneous knowledge of the bribery, it is reasonable to infer at this stage that those defendants had the more ulterior motive of lulling Metro into a sense of complacency.

48. As noted below, it is more accurate to say that these allegations establish a claim of fraud based on a breach of the duty to disclose, rather than fraud based on actual, overt misrepresentation, because the 1998 Management Reports did not contain any statements that were actually false, but only omitted to state certain facts necessary to make the statements actually made from being misleading. This is to be contrasted with another allegation in the complaint that does state a claim of fraud based on overt misrepresentation. That allegation states that Metro received the Cawley E–Mail on August 5, 1998, which stated that there was no "evidence of corruption" in Sao Paolo. Am. Compl. ¶ 36. Because Cawley is one of the individuals who allegedly participated in the bribery, the statements in this email can also serve as the basis of a common law fraud claim against MobileComm and Fidelity Brazil, which are charged with the knowledge and conduct of their agent, Cawley.

But, Metro's allegation that the Cawley E–Mail was allegedly sent "with the knowledge and approval of each defendant, including Hynes, Ceara, and [Boston Ventures] through Wallack," Am. Compl. ¶ 36, while perhaps supporting a rational inference that the statements in the email should be attributed to Hynes, Ceara, and Boston Ventures, *see supra* notes 43–44 and *accompanying text,* does not permit such an inference with respect to any other defendant. Under Rule 9(b) oblique references to false statements allegedly made by "each defendant" will not serve to attribute misrepresentations to all the defendants in an action. *See C.V. One v. Resources Group,* 1982 WL 172863, at *2–3 (Del.Super.Dec.14, 1982) (stating that collective reference to misrepresentations made by "defendants" is insufficient to satisfy Rule 9(b)). If Metro had a basis on which to allege that, for example, MetroRED was a party with whose "knowledge and approval" the statements in the Cawley E–Mail were made, Metro should have specifically named MetroRED – as it did with Hynes, Ceara, and Boston Ventures. And of course, this allegation says nothing about whether any defendant actually knew that the statements in the Cawley E–Mail were false.

ports were delivered to Metro. "While recognizing that Court of Chancery Rule 9(b) provides that 'knowledge ... may be averred generally,' where pleading a claim of fraud ... that has at its core the charge that the defendant knew something, there must, at least, be sufficient well-pleaded facts from which it can reasonably be inferred that this 'something' was knowable and that the defendant was in a position to know it."[49] The supposed "something" that the all of the defendants knew was that certain Fidelity Brazil officials had engaged in bribery. The only pled *facts* supporting the claim that the defendants – other than those who allegedly participated in the bribery – knew this "something" are that 1) those defendants were manag-

ers of Fidelity Brazil, 2) the payments were quite large, and 3) Fidelity Brazil's operations were narrowly focused on Latin America, and specifically Brazil.

 These facts do not establish that Boston Ventures, Ceara and Coppedge had actual knowledge of the bribery.[50] Nor does the complaint support an inference that those defendants were reckless; there is no factual allegation indicating that those defendants consciously ignored specific warning signs that illicit activities were occurring at the time the 1998 Management Reports were delivered. Thus, Metro has failed to allege adequately allege that Boston Ventures, Ceara and Coppedge acted with scienter in reviewing,

---

**49.** *Iotex Communications, Inc. v. Defries*, 1998 WL 914265, at *4 (Del.Ch. Dec.21, 1998).

**50.** *See, e.g., In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 539 (3d Cir.1999) ("[A]llegations that a securities-fraud defendant, because of his position within the company, 'must have known' a statement was false or misleading are precisely the types of inferences which [courts], on numerous occasions, have determined to be inadequate to withstand Rule 9(b) scrutiny. Generalized imputations of knowledge do not suffice, regardless of the defendants' positions within the company." (internal quotations and citations omitted)). While *In re Advanta Corp. Securities Litigation* evaluated allegations of scienter in light of the strict pleading standards of the Private Securities Litigation Reform Act ("PSLRA") as well as federal Rule 9(b), Delaware law also does not permit the conclusion that a defendant knew of certain facts involving an organization merely because the defendant had a position of responsibility within that organization. *See Iotex Communications*, 1998 WL 914265, at *4–5 (holding that complaint had failed to plead that defendant director had had knowledge that co-director and related corporation intended to breach certain contracts, where there was no specific allegation that defendant director had participated in the negotiation or execution of the contracts). While Ceara is a MobileComm appointee, he is not alleged to have participated in the bribery and cannot be charged with knowl-

edge of it merely because other MobileComm appointees did allegedly participate in it. And, while Metro alleges that MobileComm "actively controlled the day-to-day operations of [Fidelity Brazil] and its subsidiary MetroRED Brazil," Am. Compl. ¶ 26, it is notable that Metro does not make a similar claim against Boston Ventures, Coppedge and Wallack, instead merely alleging that MobileComm made Boston Ventures and its appointees "privy" to all material information. *Id.* Similarly, Metro claims that it was MobileComm and Fidelity Brazil which made "all significant decisions," but has only alleged that such decisions were made "with the knowledge and support of [Boston Ventures], Coppedge and Wallack." *Id.* ¶ 27. These allegations – as well as the fact that MobileComm, but not Boston Ventures, agreed in § 29 of the LLC Agreement "to provide to the Company at least one employee dedicated to the activities of the Company and its Subsidiaries ... who shall be knowledgeable and experienced in the principal business activities of the Company and its Subsidiaries and competent to manage their affairs" – support the inference that Boston Ventures and its appointees were less involved in the business than their counterparts at MobileComm, bolstering the conclusion that the complaint does not plead facts supporting their knowledge of the bribery at the time it occurred.

adopting and approving the misleading 1998 Management Reports.[51]

At most, what the alleged facts perhaps do suggest is that certain of Fidelity Brazil's managers should have monitored their subsidiaries' operations more closely. That is, these facts might support the inference that the managers should have known about the bribery, but ordinary negligence is insufficient to support a claim of common law fraud. Thus, Metro has not adequately pled scienter, and the common law fraud claims therefore cannot be sustained against Boston Ventures, Ceara and Coppedge on the basis of the 1998 Management Reports.

Metro's other allegations regarding "misrepresentations" involve not the bribery itself, but statements by certain of the defendants regarding the consequences of the bribery. These statements can be divided into two categories: 1) statements "emphasizing IPO plans";[52] and 2) more general statements that unexplained "activities of concern" had "no effect on the business and that the business was proceeding very well and as planned."[53]

As for the first category of statements purportedly "emphasizing IPO plans," these statements do not involve the sort of actionable misrepresentations of fact that can support a fraud claim. The law is rightly reluctant to find that mere expressions of opinion about the future can buttress a claim of fraud. That a statement of opinion did not prove to be an accurate forecast of the future does not mean that the predicting party misstated any actual fact that could serve as the basis for reasonable reliance. Here, the complaint does not contain any sufficiently specific statement of underlying fact related to the likely effect of the bribery scheme on Fidelity Brazil's IPO plans that Metro could have reasonably relied upon.[54]

51. In this regard, I note that I give no credence to Metro's unsubstantiated allegation that "[d]uring the period from in or before September 1997 to April 1998 [i.e., the period between the filing of Fidelity Brazil's certificate of formation and the time the bribery allegedly began], [Fidelity Brazil, MobileComm, Boston Ventures] and the [Individual Managers] planned the illicit payments to local officials." Am. Compl. ¶ 29. Of course, the reasons Metro includes this allegation are to suggest that 1) all the defendants had knowledge of the bribery before it even occurred, in order to establish scienter and 2) all the defendants failed to disclose these facts before Metro had contributed a single dollar to Fidelity Brazil, in order to seek return of funds it invested before the bribery allegedly began occurring in April 1998. It is one thing to suggest that it is rational to infer that a defendant knew of the occurrence of illicit conduct because of certain surrounding circumstances. It is quite another to level accusations that a defendant conspired to commit serious illegal conduct without a single allegation of fact supporting this conclusion. Rule 9(b) is designed precisely to prevent this sort of unsubstantiated attack.

52. E.g., Am. Compl. ¶¶ 42(c), 46, 50, 52(a)-(b).

53. Id. ¶ 42(a). See also id. ¶¶ 42(b), 52(c), 57, 58.

54. See Great Lakes Chem. Corp. v. Pharmacia Corp., 788 A.2d 544, 554 (Del.Ch.2001) ("Predictions about the future cannot give rise to actionable common law fraud. Nor can expression of opinion." (citations omitted)); Noerr v. Greenwood, 1997 WL 419633, at *4 (Del.Ch. July 16, 1997) ("A plaintiff may not simply contrast a defendant's past optimism with less favorable actual results and then contend that the difference must be attributable to fraud." (internal quotations, alterations, and citations omitted)). Indeed, some courts have gone so far as to explicitly hold that predictions of a future IPO cannot form the basis of a fraud claim. See Dooner v. Keefe, Bruyette & Woods, Inc., 157 F.Supp.2d 265, 277–78 (S.D.N.Y.2001)(dismissing claim that defendant "committed fraud by representing that the IPO was a 'sure thing' despite knowing that the IPO would not occur" because it did "not allege a material false representation of existing fact"); Weinstein v. Appelbaum, 193 F.Supp.2d 774, 779, 782

Nor does the complaint adequately allege the existence of such underlying facts; there are no particularized facts suggesting that the bribery scandal had derailed the IPO plans at the time the alleged statements were made.[55] Moreover, the complaint does not contain sufficient detail from which one could reasonably infer that the defendants did not believe that an IPO could occur.[56]

■■■■■ Turning to the second category, Metro has identified two types of "adverse consequences" on Fidelity Brazil's business purportedly caused by the bribery scandal, which supposedly demonstrate the falsity of representations made by the defendants suggesting that the scandal in fact had no impact. First, Metro alleges the existence of government investigations and lawsuits stemming from the bribery. As noted above, the complaint and MetroRED's private placement memorandum indicate that MetroRED made a self-reference regarding the bribery to the DOJ in early 1999.[57] This establishes that the directors of MetroRED knew that there had in fact been "adverse consequences" from the bribery scandal even while MetroRED's CEO, Phil Cantillon, allegedly acting as a MobileComm representative, was representing to Metro in meetings in Buenos Aires from September 1999 into 2000 that the "activities of concern" had no effect on the business.[58] These allegations

---

(S.D.N.Y.2002) (dismissing fraud claim that essentially alleged that "predictions of an IPO and fabulous riches failed to materialize," in part because it was based on alleged statements that did not constitute actionable fraud, such as statements that the defendant intended to go public in an IPO which were not adequately alleged to be untrue when made and at most involved a promise of future events, and statements that business was "still profitable" which were "mere puffery").

55. For this reason, I reject Metro's argument that the statements regarding IPO plans should be regarded as statements of fact rather than opinion because the defendants had "special knowledge" concerning the truth of such statements. *Cf. E. States Petroleum Co. v. Universal Oil Prods. Co.*, 3 A.2d 768, 776 (Del.Ch.1939). Metro has simply failed to allege the existence of any "special fact" of which the defendants were aware which would have made such statements misleading.

56. *See, e.g., Dooner,* 157 F.Supp.2d at 275, 279 (allegation that members of board should have known that IPO would not proceed in part because of SEC investigation did not suffice to support inference that statement that IPO was a "sure thing" was made with fraudulent intent).

57. In addition to the DOJ self-reference, the complaint alleges that a January 2000 FBI raid on the Miami offices of Overland Advisory, a consultant allegedly hired by or on be-

half of Fidelity Brazil, discovered documents related to a bribery scheme, Am. Compl. ¶ 48, that a grand jury began investigating the improper payments under the Foreign Corrupt Practices Act in 2000, *id.* ¶ 49, and that MetroRED Brazil was involved in a lawsuit at some unspecified time "relating to the unregistered network in Brazil," *id.* ¶ 59(b). Metro alleges, upon information and belief, that each defendant knew of all these events. Because allegations made upon "information and belief" do not satisfy Rule 9(b), *see Nutt v. A.C. & S., Inc.*, 466 A.2d 18, 23 (Del.Super.1983), *aff'd, Mergenthaler v. Asbestos Corp. of Am.*, 480 A.2d 647 (Del.1984), Metro has not adequately alleged that any defendant knew of any of these events at the time that any of the statements regarding an absence of "adverse consequences" were made in 1999 and 2000 (other than the DOJ self-reference, the defendants' knowledge of which is supported by independent documentation).

58. *See* Am. Compl. ¶ 42(b). Metro alleges that Timothy Hilton, also a MobileComm representative, made a similar statement in a meeting in Buenos Aires sometime between June and December 1999. *Id.* ¶ 42(a). Hilton is also identified as one of the "common officers and employees" shared between MetroRED, MobileComm and Boston Ventures, *id.* ¶ 55, which is a sufficient basis on which to attribute knowledge of MetroRED's DOJ self-reference to Hilton (and therefore MobileComm and Fidelity Brazil, of which he was an agent).

are sufficient to state a claim of common law fraud against MobileComm and MetroRED.[59]

Second, the other alleged "adverse consequence" of the bribery is that "fundraising efforts" were purportedly hindered by investor concern. Disregarding those allegations that are too vague and conclusory to satisfy Rule 9(b),[60] the only specific factual allegation in this regard is a claim that two banks declined to participate in a 2001 round of equity financing because of concerns about the corruption.[61] This event allegedly occurred *after* the specific statements in 1999 and 2000 regarding the absence of "adverse consequences" regarding the bribery, and therefore does not establish that those statements were misleading when made. Moreover, to the extent that certain defendants continued to assert in late 2000 and into 2001 and 2002 that there was no adverse impact on financing efforts from the scandal,[62] Metro did not rely on these statements because it had already finished contributing funds to Fidelity Brazil in October 2000.

Moreover, Metro has failed to point out any specific statement by Boston Ventures, Coppedge or Ceara regarding the purported absence of adverse consequences from the illegal payments. Metro has not alleged a single actionable mis-statement with the particularity required by Rule 9(b) made by any of those defendants after the DOJ self-reference was made. Metro has therefore failed to state a claim of common law fraud against Boston Ventures, Ceara and Coppedge based on any overt misrepresentation.

### Active Concealment

 In order to state a claim of fraud by active concealment, Metro must show that a "defendant took some action affirmative in nature designed or intended to prevent, and which does prevent, the discovery of facts giving rise to the fraud claim, some artifice to prevent knowledge of the facts or some representation intended to exclude suspicion and prevent inquiry."[63] Like a claim of overt misrepresentation, a claim of fraudulent concealment requires the plaintiff to allege "an intentional deception of the plaintiff by the defendant, which the plaintiff relies upon to his detriment."[64]

 In support of its active concealment claim, Metro argues that the defendants took affirmative steps to prevent Metro from discovering facts about the bribery or its consequences. But in the entire complaint, only one allegation even

---

**59.** Because the DOJ self-reference was allegedly never disclosed to Metro, even after the bribery scandal was uncovered in the press in April 2000, I reject the defendants' request that, at this early stage, I parse out any claim for damages based on investments made after those press reports on the theory that Metro's reliance on the defendants' statements became unreasonable as a matter of law at that time.

**60.** *E.g.,* Am. Compl. ¶ 43 (the defendants "failed to disclose the adverse effects of the illicit payments upon the business and fundraising"); *id.* ¶ 61 (Metro "learned [by 2002] that virtually all potential investors had expressed concerns about the corruption scan-dal, and that several potential investors were not willing to invest because of concern about the scandal").

**61.** *Id.* ¶ 61.

**62.** *See id.* ¶¶ 57, 58.

**63.** *Lock v. Schreppler,* 426 A.2d 856, 860 (Del.Super.1981), *superseded by statute on other grounds; see also Stephenson v. Capano Dev., Inc.,* 462 A.2d 1069, 1074 (Del.1983) (referring to *Lock,* 426 A.2d at 860–61 as addressing "concealment of material facts").

**64.** *Id.* at 861.

comes close to satisfying Rule 9(b).[65] Specifically, Metro alleges that on "several occasions in 1998 and 1999," Marcelo Melamud, an employee of Fidelity Brazil and MetroRED Brazil, refused to answer Metro's questions concerning the company's operations, indicating that he was not authorized to speak to Metro about those matters.[66] But Metro does not explain what information it was seeking from Melamud, or why it chose not to make further inquiry after being denied by him. Nor are there any allegations suggesting that Melamud even knew anything about the bribery that was "actively concealing" from Metro.

Aside from that single allegation, the complaint does not describe any specific instance in which Metro requested information, indicating what information was requested, to whom that request was made, when it was made, and the response Metro received. This is particularly remarkable in light of the facts that 1) Metro, a sophisticated investor, bargained for, and received, specific contractual inspection rights in the LLC Agreement on which it could have relied in seeking information from Fidelity Brazil or its officers;[67] and 2) there were numerous warning signs indicating that it perhaps would have been wise to exercise those contractual inspection rights, including a) the August 1998 Cawley E–Mail suggesting that there was at least reason to believe that there might have been "evidence of corruption" regarding the permitting process;[68] b) a letter in June 1999 stating that there had been unexplained "activities of concern" in MetroRED Brazil and later statements by other individuals to the same effect;[69] and c) a direct statement at a MetroRED Argentina board meeting in 2000, in response to questions by Metro about whether the then-recent revelation of the bribery scandal in the press had complicated plans for MetroRED's IPO, that the IPO "could not be performed at that time because of 'delays in Brazil.'"[70]

Metro urges me to conclude that these facts show just how cunning and deceptive the defendants were, because in each of these instances and others they were able to dissuade Metro from performing its own investigation with assurances that they had themselves addressed the matters and

---

**65.** Metro's other allegations regarding active concealment are insufficient. For example, Metro claims that certain individuals employed by Fidelity Brazil and MobileComm prevented Metro from directly contacting local officers of Fidelity Brazil and MetroRED Brazil, stating that Metro's questions would cause "distraction," and that all questions "must be made through" them. Am. Compl. ¶ 44. No specific instance in which this occurred is described; instead, Metro merely states that this interference occurred "[a]t all relevant times" or "[a]t various times before and after June 1999." *Id.* Similarly, Metro's allegation that it "tried many times" to seek information about the bribery and related matters, but various representatives of the defendants "refused to allow [Metro] to contact the local officers or to review the corporate records," *id.* ¶ 60, is conclusory and does not contain any supporting factual detail. Metro does not explain what specific information it was searching for on any of these occasions, or why it took no steps to obtain that information by other means after it was purportedly rebuffed. These allegations – while barely sufficient to state a claim for breach of Metro's contractual inspection rights under § 5(f) of the LLC Agreement under the lenient pleading standards for claims to which Rule 9(b) does not apply – are insufficiently particularized to state a claim of fraud by active concealment.

**66.** Am. Compl. ¶ 45.

**67.** LLC Agreement § 5(f).

**68.** *See* Am. Compl. ¶ 36.

**69.** *See id.* ¶¶ 41, 42(a)-(b).

**70.** *Id.* ¶ 52(a).

that there was no cause for concern. This argument is unreasonable and assumes that a sophisticated party can uncritically accept rosy depictions of obvious warning signs, and that a court of equity will later shield it from the consequences of its own lackadaisical approach to protecting its multimillion-dollar investment. Metro cannot state a fraud claim by arguing that facts were actively concealed from it when it was clearly on notice of the possible existence of those facts but nonetheless unreasonably chose not to exercise its contractual rights. Metro's claim of active concealment is dismissed.

### Silence In The Face Of A Duty To Disclose

Finally, I will address Metro's claim that the defendants committed fraud by remaining silent in the face of a duty to disclose. Metro's theory of common law fraud by nondisclosure is in some respects closely analogous to its claim that the defendants who are former managers of Fidelity Brazil – i.e., the Individual Managers, Boston Ventures and MobileComm – breached their fiduciary duties to Metro by failing to disclose the bribery.[71] In this section of the opinion, I will consider Metro's various arguments in support of its tort-based claim of fraud by nondisclosure, as well as its claim that under the unique circumstances of this case the defendants breached their fiduciary duties under principles flowing from *Malone,* after first ad-

dressing the preliminary question of whether any of the defendants owed fiduciary duties to Metro at all. In a later section of the opinion, I will consider, in conjunction with Metro's equitable fraud claims, Metro's claim that the manager-defendants are liable under *Malone* as traditionally understood because they knowingly misrepresented certain facts to Metro.

█ Boston Ventures and Mobile-Comm argue strenuously that any fiduciary duty claims against them based on conduct occurring after the 1998 Reorganization must fail because they ceased to be members of Fidelity Brazil at that time, when they purportedly transferred their membership interests to MetroRED. Metro contests the validity of that transaction, arguing that it was not effected in accordance with the LLC Agreement and that certain documents evidencing the 1998 Reorganization may not be considered on this motion to dismiss. But, I need not consider the validity of the 1998 Reorganization, because MobileComm and Boston Ventures do not dispute that the complaint clearly alleges that they continued to manage Fidelity Brazil after that time. Nor do they suggest that they ever properly removed themselves as managers of Fidelity Brazil in accordance with the LLC Agreement,[72] or that the 1998 Reorganization, even if successful, effectively relieved them of their positions as managers. Thus, the complaint contains

---

71. In a rare instance of selective targeting, the complaint explicitly limits its fiduciary duty claims to those defendants, and does not purport to state such a claim against MetroRED even though it purportedly acquired a 92% interest in Fidelity Brazil in the 1998 Reorganization. I therefore do not consider any potential fiduciary duty claims against MetroRED.

72. The LLC Agreement provides that "[t]he appointment of any person as a Manager, or

the removal of any person as a Manager, shall be effective only upon written notification thereof given by the person or entity that appointed such Manager to each other Manager and to each other person or entity that is then entitled to appoint one or more Managers." LLC Agreement § 4(d)(iv). MobileComm and Boston Ventures have not even suggested that they complied with this provision.

allegations sufficient to impose fiduciary obligations on both Boston Ventures and MobileComm throughout the relevant time period, regardless of whether they validly transferred their Fidelity Brazil membership interests to MetroRED in 1998.

 Metro advances several theories supporting its assertion that the defendants committed fraud by nondisclosure. First, Metro suggests that the mere possession of material facts gives rise to a duty to disclose those facts. That is an inaccurate statement of the law. Even fiduciaries have "no distinctive state law duty to disclose material developments with respect to the company's business" [73] in the absence of a request for "stockholder action," and there is no concept of tort law that Metro has cited which would impose such a broad and intrusive duty. Moreover, as discussed later, I am not persuaded by Metro's argument that the regular requests for capital calls made to the members of Fidelity Brazil constituted a request for owner action that would trigger each time a requirement (under either fiduciary, tort or any other legal principles) to disclose all material facts.

 Although that conclusion cuts against Metro, other aspects of the record cut against the defendants, insofar as they support Metro's second theory of fraud by nondisclosure, which is that the unique factual circumstances of this case support such a claim against certain of the defendants that is itself based in part on (and therefore redundant with) fiduciary and/or contractual obligations owed by those defendants. One of the key contractual protections granted to Metro was a duty on Fidelity Brazil's part in § 5(e) of the LLC Agreement to disclose any event reasonably like to constitute an MAE, and a duty on its managers' part, in the introductory clause of § 5, to ensure that Fidelity Brazil complied with § 5(e). This protection would enable a member to assess the reasons for a possible MAE and determine whether those reasons involved a breach of the LLC Agreement or fiduciary duty sufficient to excuse the need to make further capital contributions. To the extent that the manager-defendants of Fidelity Brazil knew of the bribery, they are, at this stage, charged with knowledge of the MAE notice provision, § 5(e), and with knowledge that Fidelity Brazil was required to give an MAE notice of the bribery to Metro in accordance with the LLC Agreement.

 In addition to any contractual duties owed by Fidelity Brazil and its managers, the managers owed a fiduciary duty of loyalty and care to Fidelity Brazil. Those duties obviously include the requirement to make good faith efforts to ensure that the LLC fulfilled its contractual duty to its members. More importantly, the manager-defendants' fiduciary duties included the duty under *Malone* not to knowingly mislead Metro. Although *Malone* addressed a situation involving fiduciaries who intentionally lied to their beneficiaries, it is only a small step, and a justified one, to conclude that a fiduciary who learns that her earlier communications to her beneficiaries were false and nonetheless knowingly and in bad faith remains silent even as the beneficiaries continue to rely on those earlier statements also breaches her duty of loyalty.

Reading the complaint in the light most favorable to Metro, the inference arises that the managers who were aware of the bribery knowingly decided not to make sure the appropriate MAE disclosure was made to Metro, even though they knew

---

**73.** *Raskin v. Birmingham Steel Corp.,* 1990 WL 193326, at *5 (Del.Ch. Dec.4, 1990).

Metro was laboring under a false impression that the permitting process was proceeding without a hitch because of the very 1998 Management Reports that they earlier authorized, and even as they continued to make capital calls on Metro. Important to my reasoning is my acceptance that these defendants knew as of early 1999 that an illegal bribery scheme had in fact been undertaken by agents of Fidelity Brazil and that the defendants nonetheless consciously decided to conceal that fact from Metro.[74] Given the fiduciary and contractual obligations outlined above, I conclude that proof of these allegations would support a claim for breach of fiduciary duty.

All this, of course, is another way of saying that the managers owed a fiduciary duty to speak in these circumstances. Metro argues that breach of this fiduciary duty to speak also supports a tort-based claim of fraud by nondisclosure in the face of such a duty, and the defendants have not argued that Metro may not bring such

a fraud claim merely because it is a redundant variant of Metro's fiduciary duty claim. I therefore conclude that Metro may also bring a claim of common law fraud by nondisclosure based on these facts as well.[75]

■■■■■ Metro's third theory of common law fraud by nondisclosure is that a defendant can be liable for fraud by failing to disclose information necessary to make other statements made by that defendant not misleading.[76] Again, because this is a form of common law fraud, Metro must establish scienter: Metro must show that the statements were made with contemporaneous knowledge or reckless disregard of the information which rendered misleading the statements actually made.[77] The only representations that satisfy this standard are those statements regarding the permitting process in the 1998 Management Reports, which are attributable to MobileComm, Heaton, Hynes and Fidelity Brazil, and which were made with those

---

74. If this case were to go to trial and were the facts to show that it was not certain whether any bribery had taken place and that the defendants had made a good faith decision to fully investigate the facts before making any corrective disclosure, then the reasoning I have outlined would not pertain and *Malone* would suggest that the defendants should prevail.

75. For similar reasons, Metro may pursue a fraud by nondisclosure claim against Fidelity Brazil on the basis of its alleged breach of § 5(e).

76. *E.g., DRR, L.L.C. v. Sears, Roebuck & Co.,* 949 F.Supp. 1132, 1141 (D.Del.1996) ("Accurate but incomplete assertions may be fraudulent in the absence of qualifying material."); *Lock v. Schreppler,* 426 A.2d 856, 862 (Del.Super.1981) ("Although there is no general duty to speak, nevertheless, if a person undertakes to speak, he then has a duty to make a full and fair disclosure as to the matters about which he assumes to speak."), *superseded by statute on other grounds.*

It seems that the phrase "silence in the face of a duty to speak" is itself a somewhat misleading description of this precise theory of fraud: A defendant cannot be liable for truly remaining silent, because the duty to speak only arises once the defendant has chosen to make other statements. Thus, the nondisclosure theory of fraud is perhaps better understood as a duty not to make misleading statements.

77. *Sears, Roebuck & Co.,* 949 F.Supp. at 1141 ("While such ignorance [of facts omitted from certain representations by defendant] may have been sloppy or negligent, a higher level of scienter is needed for common law fraud."); *Wolf v. Magness Constr. Co.,* 1994 WL 728831, at *5 (Del.Ch. Dec.20, 1994) (where party "intended to provide [plaintiff] with accurate information," and there was no evidence that party's misstatements were intentionally or recklessly made, plaintiff had not established scienter requirement).

defendants' knowledge that those statements were misleading because they failed to disclose information about the bribery. Once those defendants undertook to communicate with Metro about the permitting process, they were under a duty to disclose all facts within their knowledge necessary to prevent the 1998 Management Reports from being misleading, including facts about the alleged illegal payments. Their failure to disclose those facts constitutes actionable fraud by nondisclosure.

The other managers (i.e., Boston Ventures, Ceara and Coppedge) cannot be held liable under this particular theory of fraud by nondisclosure because they cannot be deemed to have had contemporaneous knowledge of the bribery scheme when the 1998 Management Reports were delivered. But, they can potentially be liable in fraud under the unique fiduciary- and contract-based theory discussed above. Such liability would extend only to the period after they became aware of the bribery scheme and did not correct the 1998 Management Reports that they had previously authorized and that (as to them, anyway) unwittingly created a materially misleading impression.

*The Relationship Between Metro's Equitable Fraud Claims And Its Disclosure–Related Breach Of Fiduciary Duty Claims*

By this time, it ought to be obvious that there is a substantial overlap between Metro's so-called fraud claims – be they of the common law or equitable variety – and its fiduciary duty claims. As has just been shown, Metro's ability to state certain of its common law claims is inextricably linked to the fact that certain of the defendants it has sued were Metro's fiduciaries in Metro's capacity as a member of Fidelity Brazil. The managers' obligation to take good faith efforts to cause Fidelity Brazil to honor its contractual obligations to its members in large measure shapes their communication obligations as fraud defendants. This raises the natural question of whether it really makes sense for an LLC member like Metro to be able to sue the LLC's managers for both common law fraud and breach of fiduciary duty based on the identical disclosure-related conduct. But, as we will see, both of those theories, in this case at least, require Metro to show a similar level of culpability on the part of the defendants. Perhaps for that reason, the defendants have not contended, at least at this stage of the case, that Metro's common law fraud claims cannot proceed along with any disclosure-based claims for breach of fiduciary duty.

By contrast, the defendants have argued that allowing a so-called equitable fraud claim, which does not require a showing of scienter, to proceed against the defendants who were managers of Fidelity Brazil would in essence undercut an important policy choice the Delaware Supreme Court made in articulating the basis upon which fiduciaries like LLC managers could be held liable for disclosure-related fiduciary breaches in circumstances such as are involved in this case. In this section of the opinion, I focus on that argument, and determine whether Metro has stated disclosure-related breach of fiduciary duty claims against any of the defendants, and whether it may proceed with equitable fraud claims against the defendants who were managers of Fidelity Brazil.

The intertwining of fraud and fiduciary concepts in this context should surprise no one. There is an obvious and important reason for the overlap: Delaware's law of fiduciary duty is itself an aspect of our common law. As such, it is unsurprising that our law of fiduciary duty has evolved to the point in which there are specific standards that govern the liability of entity fiduciaries, such as managers of LLCs or

more commonly corporate directors, for disclosures or non-disclosures to entity owners.

When Delaware courts refine these standards – essentially specialized common law and equitable fraud rules for fiduciaries – they must take into account context-specific policy concerns. Some of these are worth noting by way of example. An initial one deals with the common context in which disclosure-related claims against fiduciaries arise, a context that is usually distinct from the common form in which fraud claims are pled. In the usual fraud case, the speaking party who is subject to an accusation of fraud is on the other side of a commercial transaction from the plaintiff, who alleges that but for the material misstatements or omissions of the speaking party he would not have contracted with the speaking party. On the other hand, when, by contrasting example, corporate directors are sued by stockholders because a proxy statement they authorized to be sent by the corporation is deficient in some way – e.g., because it fails to disclose a material fact – those directors often have no personal financial interest in the outcome of the vote on which the stockholders are acting. In other words, the context is quite different than the ordinary fraud setting in which the speaking party is attempting to induce reliance by another party with which it wishes to contract directly. Frequently, directors of corporations are simply trying to do their job of ensuring the corporation makes adequate disclosure and sometimes fall short of the mark. That is a consideration our law

must take into account. So, too, must our law take into account the importance of giving stockholders (or more generally other owners of business entities) reliable information upon which to base important voting and tendering decisions. Yet another factor that our law must take into account is the pervasive federal regulation of public company disclosures, suggesting the need for sensitivity to the appropriate role of additional state regulation in that realm.

These, and other factors, have led the Delaware courts to articulate certain standards governing the disclosure-related duties of the fiduciaries of Delaware business entities.[78] Those standards operate differently depending on the context in which the fiduciaries speak. When the fiduciaries communicate with the beneficiaries in the context of asking the beneficiary to make a discretionary decision – such as whether to grant a proxy, to vote yes or no on a particular matter, or to seek appraisal or accept merger consideration – the fiduciary has the duty to disclose all material facts bearing on the decision at issue.[79] To prevail on a claim for breach of this duty (traditionally described as a "fiduciary duty of disclosure"), a beneficiary, such as a stockholder, need not prove actual reliance on the disclosure, but simply that there was a material misdisclosure.[80] In this manner, the standards that a fiduciary faces are tougher than the common law and equitable fraud standards, which always require proof of reasonable reli-

---

78. These standards have been mostly articulated in the corporate context but the corporate standards often serve as the default rule in the alternative entity context unless they are preempted by valid contracting decisions.

79. *E.g., Loudon v. Archer–Daniels–Midland Co.,* 700 A.2d 135, 137 (Del.1997) ("Delaware law of the fiduciary duties of directors ...

establishes a general duty of directors to disclose to stockholders all material information reasonably available when seeking stockholder action.").

80. *See Malone v. Brincat,* 722 A.2d 5, 12 (Del. 1998).

ance.[81]

Moreover, while equitable fraud potentially provides a remedy for negligent or even innocent misrepresentations, a fiduciary in the corporate context cannot be held liable for damages for a failure to disclose a material fact unless that fiduciary acted with at least gross negligence.[82] Because fiduciaries of business entities must take risks and make difficult decisions about what is material to disclose, they are exposed to liability for breach of fiduciary duty only if their breach of the duty of care is extreme. Furthermore, by contract – such as an exculpatory provision in a corporate charter or in an LLC Agreement – the beneficiaries may insulate their fiduciaries from liability for any breach of the duty of care,[83] including one related to disclosure.[84] In the alternative entity context, the beneficiaries may even go further and insulate them from claims for breach of the duty of loyalty, at least to some extent.[85] Each of these decisions reflects context-specific policy concerns recognized by either the General Assembly or our courts.

Another important policy choice was made by the Delaware Supreme Court in its *Malone v. Brincat* decision. For years there had been uncertainty about whether the state law of fiduciary duty would recognize a cause of action against corporate directors for issuing misleading disclosures to stockholders when those disclosures were not connected to a specific request for the stockholders to make a discretionary voting or tendering decision. In *Malone*, the Supreme Court said that state law did recognize such a claim, describing it not as a claim for the breach of the so-called fiduciary duty of disclosure but as a species of the fiduciary duty of loyalty.[86] By contrast to the situation when directors issue communications in connection with a discretionary vote or tender decision, however, the Supreme Court set a very high bar for plaintiffs seeking to prove a claim. In the *Malone* context, a plaintiff had to prove that the directors "knowingly disseminate[d] false

81. *See St. James Recreation, LLC v. Rieger Opportunity Partners, LLC,* 2003 WL 22659875, at *3 (Del.Ch. Nov.5, 2003) ("Under Delaware law, justifiable reliance is an element of both common-law fraud and equitable fraud." (footnotes omitted)).

82. *See, e.g., Turner v. Bernstein,* 776 A.2d 530, 542–43 (Del.Ch.2000); *Nagy v. Bistricer,* 770 A.2d 43, 59–60 (Del.Ch.2000).

83. Exculpatory charter provisions may be enacted by corporations pursuant to 8 *Del. C.* § 102(b)(7). While the LLC Act contains no provision directly analogous to § 102(b)(7), it does provide that a "member's or manager's or other person's duties and liabilities [including fiduciary duties] may be expanded or restricted by provisions in the limited liability company agreement." 6 *Del. C.* § 18–1101(c)(2).

84. *See Zirn v. VLI Corp.* ("Zirn II"), 681 A.2d 1050, 1062 (Del.1996) ("A good faith erroneous judgment as to the proper scope or content of required disclosure implicates the duty of care rather than the duty of loyalty. Thus, the disclosure violations at issue here fall within the ambit of the protection of section 102(b)(7)." (citation omitted))

85. *See Gotham Partners, L.P. v. Hallwood Realty Partners, L.P.,* 817 A.2d 160, 167–68 (Del. 2002) (suggesting that there may be limits on the ability of parties to a limited partnership agreement to completely eliminate the fiduciary duties the general partner would otherwise owe to the other partners).

86. *See Malone v. Brincat,* 722 A.2d 5, 10 (Del. 1998) ("The issue in this case is not whether Mercury's directors breached their duty of disclosure. It is whether they breached their more general fiduciary duty of loyalty and good faith by knowingly disseminating to the stockholders false information about the financial condition of the company. The directors' fiduciary duties include the duty to deal with their stockholders honestly.").

information." [87] This level of proof is similar to, but even more stringent than, the level of scienter required for common law fraud.[88] Later cases have logically read *Malone* as also contemplating a requirement of reasonable reliance in the non-vote and non-tender context.[89]

The decision by the Supreme Court to set a high bar for *Malone*-type claims was not, I think, inadvertent and represented an effort on its part to ensure that our law was not discordant with federal standards [90] and that our law did not encourage a proliferation of disclosure claims outside the discretionary vote or tender context by exposing corporate directors to an additional host of disclosure claims that did not involve the need to show reliance or scienter. That policy choice is one that commands the respect of this court and necessarily influences my decision on this motion.

 To sustain Metro's equitable fraud claim would threaten the *Malone* policy choice in a major way. Although Metro claims that this case implicates the disclosure standards that apply in the discretionary tender or vote context, that argument is not convincing. Unlike a voting or tendering decision, the requirement of the members of Fidelity Brazil to respond to periodic capital calls was a contractual mandate. As the managers made their requests in accordance with the LLC Agreement, the members had to respond. I believe it would undermine the effective operation of LLCs like Fidelity Brazil for this common arrangement to come with a judicially encrusted requirement that the LLC managers provide proxy-statement-like disclosures each time they make a capital call. This would be inefficient and would threaten to convert the duty to disclose all material facts in connection with a discretionary vote or tender into a pervasive, across-the-board rule governing all entity disclosures, because entity owners can usually connect any disclosure to a decision they might make (e.g., the decision whether to hold or sell their ownership interests). This does not mean that I believe that Metro's duty to respond to capital calls was not subject in some way to the information it received as I discuss earlier I think it was. But it does mean that its requirement to respond to capital calls did not trigger a duty on the part of Fidelity Brazil's managers to disclose all material facts [91] each time a capital call

87. *See id.* at 9. *See also Jackson Nat. Life Ins. Co. v. Kennedy*, 741 A.2d 377, 389 (Del.Ch. 1999) ("[O]ne who pleads that directors deliberately omitted information from a communication with ... stockholders under circumstances that suggest an intent to mislead the stockholders has set forth a violation of the fiduciary duty of loyalty...").

88. A common law fraud claim can be supported by a showing of reckless indifference. *See Stephenson v. Capano Dev., Inc.*, 462 A.2d 1069, 1074 (Del.1983). *Malone* seems to require knowing misconduct. *See Malone*, 722 A.2d at 9 (indicating that plaintiff must prove that directors *"knowingly* disseminate[d] false information"* (emphasis added)). *See also Steinman v. Levine*, 2002 WL 31761252, at *13 (Del.Ch. Nov.27, 2002) (holding that complaint did not state claim for breach of fiduciary duty of loyalty under *Malone* and its progeny because alleged misstatements were "not false communications from directors *who were deliberately misinforming shareholders"*), *aff'd*, 822 A.2d 397 (Del.2003) (TABLE).

89. *See A.R. DeMarco Enters., Inc. v. Ocean Spray Cranberries, Inc.*, 2002 WL 31820970, at *4 n. 10 (Del.Ch. Nov.26, 2002) ("When shareholder action is absent, plaintiff must show reliance, causation, and damages [to state a claim under *Malone* ].").

90. *See Malone*, 722 A.2d at 13 (discussing implications of federal law on claim being recognized in that case).

91. Whatever those would be in this unusual context.

was made. Rather, the appropriate corporate law analogy to draw upon is *Malone* and the standard it articulates.

In this context, *Malone* implies that Metro states claims against the former managers of Fidelity Brazil for misdisclosures only to the extent that it can show that those defendants knowingly misled Metro – that is, that they acted with scienter and that Metro reasonably relied upon the defendants' misstatements. Put simply, the defendants face viable *Malone* claims in essentially the same circumstances as they face viable claims for common law fraud.

For example, Metro alleges that Cawley, as MobileComm's designated manager of Fidelity Brazil, sent Metro an email on August 5, 1998 stating that there was no "evidence of corruption" at MetroRED Brazil. Metro also alleges that Cawley was one of the people involved in the bribery scheme, so his knowledge of that scheme is attributable to MobileComm, of which he was an agent. These allegations, if proved, are sufficient to hold Mobile-Comm liable under *Malone* for breach of the fiduciary duty of loyalty.[92] Similarly, Hynes and Heaton, as former managers of Fidelity Brazil who both allegedly participated in the bribery and "reviewed, adopted and approved" the misleading 1998 Management Reports which failed to mention it, can be held liable for knowingly misrepresenting facts to Metro.

■■■ The difficulty Metro faces is that it has not sufficiently alleged that any of the other defendants who are former managers of Fidelity Brazil – i.e., Boston Ventures, Ceara and Coppedge – *knowingly* misrepresented any facts to Metro, in the 1998 Management Reports or otherwise.

Therefore Metro has failed to state a claim under *Malone* against those defendants until the time when the complaint alleges they came into knowledge of the bribery scheme, which was in early 1999. As of that time, the complaint supports the inference they knew that the 1998 Management Reports – which they had authorized – were clearly misleading, knew that Metro was therefore laboring under a false impression, knew that Fidelity Brazil had an affirmative obligation to provide Metro with notice of circumstances constituting an MAE, and yet nonetheless knowingly failed to take steps to correct the earlier misleading Reports that they had authorized without previous knowledge of their misleading nature and failed to cause Fidelity Brazil to give an overdue MAE notice. Stated simply, I believe it fully in keeping with *Malone* that a fiduciary be held responsible if it authorizes without fault or knowledge a misleading disclosure, later comes into knowledge of the misleading nature of the previous communication, and knowingly and in bad faith (in other words, "dishonestly") fails to correct the misleading impression created by the earlier communication. Likewise, if a fiduciary comes into possession of facts – such as evidence of an MAE – and knows that the entity has an obligation to provide disclosure of those facts to its members and consciously and in bad faith chooses to have the entity continue to withhold the facts that should have been disclosed, *Malone's* teaching suggests that a viable fiduciary duty claim exists.

By their very nature, however, these *Malone* claims will be difficult to prove because Metro must ultimately demonstrate both scienter and reasonable reli-

---

**92.** Similarly, Metro alleges that Phil Cantillon, an agent of MobileComm and MetroRED's CEO, told Metro in 1999 and 2000 that the bribery had had no adverse consequences on Fidelity Brazil, knowing of the self-reference to the DOJ in early 1999. This also states a claim for breach of fiduciary duty against MobileComm.

ance. Moreover, Metro has been unable to state claims under *Malone* (or under the doctrine of common law fraud) against all of the defendants for certain of the periods for which Metro seeks damages. For that reason, Metro understandably asserts its equitable fraud claim with exceptional vigor in this case, because that claim – unlike its common law fraud and *Malone* claims – does not require a showing of scienter.[93] Specifically, Metro argues that even if it has failed to allege that any of Boston Ventures, Ceara and Coppedge made the misstatements in the 1998 Management Reports with scienter, the complaint nonetheless states a claim of equitable fraud against them because that doctrine does not require proof that the statements were made with contemporaneous knowledge or reckless disregard of the bribery.

██ But, if Metro's equitable fraud claims are permitted to proceed, the defen-

dants potentially can be held personally liable in damages for conduct that would not involve a breach of their fiduciary duties under *Malone*. That is, allowing Metro to assert its equitable fraud claims would be tantamount to permitting it to evade the strictures of *Malone*. No case has addressed the question of whether a fiduciary can be liable in damages for equitable fraud when no recovery would be available under a fiduciary duty theory.[94] While certain cases have apparently entertained the possibility that an equitable fraud claim could be asserted against a fiduciary, none of the cases of which I am aware considered the direct clash between policy values that would result if a plaintiff was able to press an equitable fraud claim against defendants in a situation in which *Malone* teaches that no claim for breach of fiduciary duty was sustainable.[95]

93. *See Zirn v. VLI Corp.* ("Zim I"), 681 A.2d 1050, 1061 (Del.1996) ("To state a *prima facie* case for equitable fraud, plaintiff must ... satisfy all the elements of common-law fraud with the exception that plaintiff need not demonstrate that the misstatement or omission was made knowingly or recklessly."). I note that the only relief that Metro apparently seeks for its equitable fraud claims is "rescission" of its investments, which appears to be an artful way of asking for damages. Some cases suggest that an equitable fraud claim should be dismissed where a plaintiff does not seek equitable relief. *See Wolf v. Magness Constr. Co.*, 1994 WL 728831, at *5 (Del.Ch. Dec.20, 1994) (stating that "[w]hether a court of equity can provide relief for an unintentional fraud depends on the relief sought" and holding that plaintiffs had not stated claim for equitable fraud because they were not seeking equitable relief); *DRR, L.L.C. v. Sears, Roebuck & Co.*, 949 F.Supp. 1132, 1137–38 (D.Del.1996) (same). The defendants have not sought dismissal of the equitable fraud claims on this ground, and therefore I do not reach it.

94. In *Gaffin v. Teledyne, Inc.*, which permitted equitable fraud claims in a corporate case, the Supreme Court did not address this question, specifically stating that "[t]he only defen-

dant is the corporate entity ... so there are no fiduciary duty claims." 611 A.2d 467, 472 (Del.1992). One reason no case has decided whether damages may be obtained for equitable fraud even where a fiduciary theory does not justify that award is that equitable fraud claims are often brought as class actions and are therefore dismissed under the rule of *Gaffin* that fraud claims cannot be brought as class actions. *See, e.g., Oliver v. Boston Univ.*, 2000 WL 1091480, at *11 (Del.Ch. July 25, 2000) (dismissing equitable fraud claims against directors for this reason).

95. The previous cases are arguably different from this one in another important respect: None of them involved a situation where the fiduciary did not know the facts that were misrepresented or undisclosed; rather, it seems that in all the cases in which equitable fraud claims were asserted against fiduciaries, the defendants apparently knew of the underlying information and either made a "good faith erroneous judgment as to the proper scope or content of required disclosure," which implicated the duty of care, *see Zirn II*, 681 A.2d 1050, 1060–62 (Del.1996) (holding that damages could not be obtained for this sort of claim, whether on theory of equitable fraud or breach of fiduciary duty of

■ I therefore view the question presented as an open one. Metro's primary argument why I should answer that question in its favor is that permitting equitable fraud claims in the *Malone* context would not unduly expand the potential liability of fiduciaries for two main reasons.[96] First, Metro argues that the requirement that the defendant "intended to induce" the plaintiff to take some action or inaction makes it unlikely that every negligent misrepresentation would expose a fiduciary to liability for equitable fraud. This argument is questionable,[97] but in any event it is beside the point. The question is not whether permitting equitable fraud claims would expand the liability that directors face to an unacceptable degree. The question is whether general principles of equitable fraud – which were developed in circumstances that do not necessarily take into account the peculiar relationship between corporate entities, fiduciaries and their owners, and the sensitive federal policies in the area of corporate disclosure[98] – should operate to create personal liability even where the specific application of fiduciary principles requires the opposite conclusion. Stated this way, it should be apparent why this question should be answered in the negative and that sanctioning the procession of a claim that does not require a showing of scienter and therefore exposes fiduciaries who acted in good faith to liability is inconsistent with *Malone*.

Metro's second argument is of similar ilk and involves a strange feature of Delaware class action law, which is our law's view that there can be no class action as to claims for which reliance is a required element.[99] This view, which is different from that which pertains in federal practice, does not help Metro. For one thing,

care, where corporation had exculpatory charter provision), or decided – not necessarily in good faith – not to disclose the information, which implicated the duty of loyalty. *See Oliver*, 2000 WL 1091480, at *8 n. 25 (holding that defendant directors would not be protected by exculpatory charter provision for claim of breach of duty of disclosure because "plaintiffs adequately plead that the alleged misrepresentations and omissions were the product of self-dealing, not good faith errors in judgment"); *Zirn I*, 621 A.2d at 777–78 & n. 2, 783 (Del.1993) (describing claim of bad faith nondisclosure as one of equitable fraud and of breach of the duty of loyalty). *See also Arnold v. Soc'y for Sav. Bancorp, Inc.*, 650 A.2d 1270, 1288 n. 36 (Del.1994) (stating that the equitable fraud claim in *Zirn I* did not involve a good faith omission).

In any event, absent bad faith action, it seems to me that permitting an equitable fraud claim to proceed in the *Malone* context when a *Malone* claim is not viable eviscerates the policy choice made in *Malone*.

**96.** Metro's third argument in this regard is that fiduciaries could avoid liability merely by adopting exculpatory charter provisions under 8 *Del. C.* § 102(b)(7) or similar contractual provisions adopted in conformity with alternative entity statutes, such as the LLC Act.

**97.** As a doctrinal matter, equitable fraud only requires a plaintiff to prove that the defendant intended the plaintiff to take some action *or inaction* in reliance on the defendant's misrepresentation. Thus, for example, a plaintiff stockholder could argue that a defendant director made a representation with the intent to induce the plaintiff to stay invested in the company and not sell her shares, and hold the director liable in damages by merely showing that the director should have known the representation was false (or perhaps even if there was no reason to know of its falsity, on a theory of innocent misrepresentation).

**98.** *E.g., Wolf v. Magness Constr. Co.*, 1994 WL 728831 (Del.Ch. Dec.20, 1994) (addressing question of whether a sales agent's negligent misrepresentation to a home-buyer that a sales contract promised them a drainage easement with a "gentle swale" entitled them to relief under equitable fraud theory when the builder installed a wide ditch).

**99.** *See Gaffin*, 611 A.2d 467, 474.

large holders – like Metro – can bring claims and institutional investors in the corporate context could form virtual classes. More important, the key problem is that sanctioning an equitable fraud claim makes fiduciaries potentially liable for good faith mistakes in a context in which our Supreme Court has said that should not be so.

■ Bolstering my conclusion that Metro should not be permitted to pursue its equitable fraud claims here is the fact that Delaware's fiduciary disclosure regime is designed with especial sensitivity to the fact that corporate disclosure is an area heavily regulated by a myriad of federal statutes and SEC rules. Although Fidelity Brazil was not a public company, our common law of entities must take into account the pervasive federal regulation of public company disclosures as well as the reality that federal statutes also proscribe securities fraud involving private entities. Indeed, the Delaware Supreme Court recognized that it was treading near sensitive federal territory when it announced in *Malone* that directors may breach their fiduciary duties by intentionally misleading stockholders even when not seeking stockholder action, and carefully noted that the claim recognized in that case did not interfere with the then-recently enacted Securities Litigation Uniform Standards Act ("SLUSA").[100] It consciously chose a scienter-based standard of review to harmonize our law with the federal regime. A ruling for Metro would cause discord.[101]

---

**100.** SLUSA precludes most state court class actions based on false or misleading statements made in connection with the purchase or sale of securities. In *Malone*, the Supreme Court noted that the cause of action recognized in that case did not involve the "purchase or sale of securities" (because it involved shareholders who did not sell) and also fell within the "Delaware carve-out" for claims based on "fiduciary disclosure obligations." *Malone v. Brincat*, 722 A.2d 5, 13 (Del.1998).

**101.** A hypothetical should illustrate how recognition of Metro's equitable fraud claim would create tension with the federal-state scheme of disclosure regulation. Imagine a corporation issues a press release stating that 1) a major division had unexpectedly low sales in the last fiscal year, and 2) some members of senior management and the board were considering whether to take the company private. Imagine further that a stockholder sells some of her shares in response to those statements, and it later turns out that the statements regarding sales figures were inaccurate – but that the directors who approved those statements did not know of this fact.

The stockholder now understandably wishes to sue. Under the PSLRA, all private plaintiffs (not just class-action plaintiffs) suing under § 10(b) of the Securities Exchange Act must state with particularity the facts giving rise to a strong inference that a defendant acted with the requisite state of mind, 15 U.S.C. § 78u–4(b)(2) (which the Exchange Act does not define, but which the Third Circuit and other federal courts have defined as generally requiring at least a recklessness, *see In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 534 (3d Cir.1999). *See also Greebel v. FTP Software, Inc.*, 194 F.3d 185, 200 (1st Cir.1999)). If the shareholder cannot bring a claim in federal court under § 10(b) against a director because she cannot satisfy the strict standard for pleading recklessness – and cannot bring a fiduciary duty claim in the Delaware courts under *Malone* because the directors did not deliberately mislead the stockholders – why should she be permitted to bring an equitable fraud claim?

It is true that the Securities Exchange Act contains a savings clause providing that "the rights and remedies provided by this chapter shall be in addition to any and all other rights and remedies that may exist at law or in equity." 15 U.S.C. § 78bb(a). But my conclusion that Metro cannot assert its equitable fraud claims is not premised on the theory that federal law preempts such claims. Rather, it is premised on the fact that, with respect to the question of what state of mind is required to create personal liability for false statements, whether such statements are made in connection with the purchase or sale of securities or in communications from an

In sum, if Metro's equitable fraud claim were permitted to proceed, Delaware's carefully crafted system of regulating corporate disclosure, which takes into account the special relationship between directors and stockholders as well as the sensitive federal-state balance in this area, would be subverted and stockholders would be permitted to sue their fiduciaries for damages based on misleading statements where the defendant was, at most, ordinarily negligent in not knowing the facts that made those statements misleading (or indeed even if the misstatement was entirely innocent), even where no request for stockholder action is made.

These and other troubling issues lead me to the conclusion that Metro's failure to allege a *Malone* claim against Boston Ventures, Coppedge and Ceara is fatal to its equitable fraud claims.[102] The equitable fraud claims against those defendants are therefore dismissed.[103]

### *Those Managers Who Participated In The Bribery Breached Their Fiduciary Duties*

Metro claims that certain of the defendants breached their duty of loyalty by executing a plan to bribe metropolitan officials in Brazil in order to obtain permits for Fidelity Brazil. Specifically, Metro alleges that Hynes, Heaton, Cawley and Vital participated in the bribery scheme.[104] Hynes and Heaton are former managers of Fidelity Brazil who are named as defendants, and Cawley, while not named as a defendant, was designated by Mobile-Comm to act as a manager of Fidelity

---

entity to its equity holders, the federal and Delaware authorities that have addressed that question have never concluded that mere negligence is sufficient to impose personal liability. The fact that the more generalized doctrine of equitable fraud might be satisfied by ordinary negligence or even a purely innocent state of mind cannot trump the specific legal requirements that have been developed in response to the unique concerns that arise in the corporate disclosure context.

**102.** This court's recent decision in *In re Healthsouth Corp. S'holders Litig.*, 845 A.2d 1096 (Del.Ch. Nov.24, 2003), *aff'd*, 2004 WL 835879 (Del. Apr.14, 2004) (TABLE), is not inconsistent with this holding. In that case, Richard Scrushy, the former CEO and chairman of HealthSouth, sold stock back to HealthSouth in a "Buyback" at a price based on the market price of the company's stock, which involved an implicit representation by Scrushy that the market price was a reliable indicator of value. Because that market price was inflated by materially inaccurate financial statements Scrushy himself had signed, this court held that Scrushy was liable to the corporation for equitable fraud irrespective of whether he actually knew of the material misstatements in the company's financials.

*HealthSouth* did not involve the question addressed here, which is whether a fiduciary who fully complies with her fiduciary duties in connection with statements made by an entity to its equity holders in the ordinary course of business can nonetheless be held personally liable for equitable fraud. Rather, *HealthSouth* addressed the question of whether an individual who personally entered into a commercial transaction with a corporation could be held liable on the basis of false representations made in connection with that transaction irrespective of his knowledge of their falsity. The court did not even address the issue of whether Scrushy had breached his fiduciary duties in connection with the Buyback, a transaction which he proposed not in the ordinary course of fulfilling his corporate duties but rather in his capacity as a stockholder selling stock to a corporation.

**103.** I note that this conclusion does not preclude Metro from asserting its equitable fraud claim against Fidelity Brazil itself on the basis of any actionable misrepresentations made by it, assuming the other elements of the claim are satisfied. Similarly, Metro's equitable fraud claim can be pursued against MetroRED, because Metro has not argued that that defendant owed it any fiduciary duties.

**104.** While Metro also alleges that all the defendants participated in the planning of the bribery, this allegation is utterly conclusory and is therefore disregarded.

Brazil on its behalf. These allegations are sufficient to state a claim for breach of fiduciary duty of loyalty against Hynes, Heaton and MobileComm.

### Metro's Statutory Claims

Metro also asserts claims under 6 *Del. C.* § 18–804 of the LLC Act and 6 *Del. C.* § 1304(a) of the Fraudulent Transfers Act against MobileComm, Boston Ventures, Fidelity Brazil and MetroRED. Put bluntly, Metro's articulation of these claims verges on the incomprehensible. First, with respect to Metro's LLC Act claim, the best I can do to describe that claim is to quote that portion of Metro's answering brief that summarizes it:

> [Metro] has pled that [Fidelity Brazil], and [MobileComm] and [Boston Ventures] as controlling members of [Fidelity Brazil] by themselves or through their agent [MetroRED], did not make such provision as was reasonably necessary to provide compensation for [Metro's] claim, that [MobileComm] and [Boston Ventures], by acquiring shares in MetroRED, received distributions in

violation of § 18–804(a), that they knew that the distribution violated of [sic] § 18–804(a), and that as a result, such distributions should be restored to [Fidelity Brazil] and be available to [Metro], which is a creditor of [Fidelity Brazil].[105]

Comparing this description to the actual statutory language,[106] Metro's LLC Act claim appears to have two components. First, Metro apparently argues that Fidelity Brazil's failure to make reasonable provision for Metro's claims against Fidelity Brazil based on the LLC Agreement upon the winding up and dissolution of Fidelity Brazil violated § 18–804(b)(3). As discussed above, this is a tenable argument and states a claim that Fidelity Brazil's certificate of cancellation should be nullified so that Metro can sue Fidelity Brazil directly[107] and bring derivative actions on Fidelity Brazil's behalf, such as claims under § 18–804(c) or fiduciary duty claims.

Regrettably, Metro has not pled its statutory claim as a derivative claim. It has, however, pled facts (however inadvertently) that suggest that demand is excused as

---

105. Pl.'s Ans. Br. in Opp. to Defs.' Mot. to Dismiss, at 34–35 (citations omitted).

106. The portions of § 18–804 that Metro cites in support of its claim are:

(a) Upon the winding up of a limited liability company, the assets shall be distributed as follows:
(1) To creditors, including members and managers who are creditors, to the extent otherwise permitted by law, in satisfaction of liabilities of the limited liability company (whether by payment or the making of reasonable provision for payment thereof) ...;
....
(b) A limited liability company which has dissolved:
....
(3) Shall make such provision as will be reasonably likely to be sufficient to provide compensation for claims that have

not been made known to the limited liability company or that have not arisen but that, based on facts known to the limited liability company, are likely to arise or to become known to the limited liability company within 10 years after the date of dissolution.
....
(c) A member who receives a distribution in violation of subsection (a) of this section, and who knew at the time of the distribution that the distribution violated subsection (a) of this section, shall be liable to the limited liability company for the amount of the distribution....

107. It is not clear that MetroRED assumed all of Fidelity Brazil's liabilities at the time of the 2000 Reorganization, so MetroRED would not necessarily stand in Fidelity Brazil's shoes for purposes of any direct claims that Metro has against Fidelity Brazil such as contractual claims under the LLC Agreement.

to any such claims (whether they be considered derivative or double derivative in nature). In the interests of efficiency given the extensive briefs of the parties, I treat the § 18–804(c) claim as being advanced derivatively on behalf of Fidelity Brazil. Nonetheless, any of the claims that I hereafter find viable should be repled in proper form with a formal allegation of demand excusal.

Obviously, the reason that Metro wants to bring Fidelity Brazil back into existence is to ensure that that entity has sufficient funds to satisfy any judgment Metro obtains against it, which brings us to the key component of Metro's LLC Act derivative claim: Metro argues that MobileComm, Boston Ventures and MetroRED have received distributions in violation of § 18–804(a), which renders them liable to Fidelity Brazil under § 18–804(c). The relief that Metro seeks for this claim is that "[s]uch distributions should be restored to [Fidelity Brazil] and be available to [Metro], which is a creditor of [Fidelity Brazil]." [108]

Section 18–804(c) provides that "[a] member who receives a distribution in violation of subsection (a) of this section, and who knew at the time of the distribution that the distribution violated subsection (a) of this section, shall be liable to the limited liability company for the amount of the distribution." Moreover, a three-year statute of limitations applies to actions under § 18–804, running from the date of the allegedly illegal distribution.[109]

 As the complaint is presently pled, Metro has not stated a viable derivative claim on Fidelity Brazil's behalf against MobileComm and Boston Ventures under § 18–804(c). There are numerous reasons for this conclusion. First, any claim based on "distributions" they received in the 1998 Reorganization fails because a) it is barred by the three-year statute of limitations; [110] and b) § 18–804(a) applies only to LLC's that are winding up, which Fidelity Ventures did not do until two years later in 2000. Moreover, Metro has failed to allege that either of those defendants ever received (in either 1998 or 2000) any distributions *from Fidelity Brazil*. Rather, Metro alleges that 1) in connection with the 1998 Reorganization MobileComm and Boston Ventures transferred *their* interests in Fidelity Brazil to MetroRED in exchange for MetroRED shares; [111] and 2) MobileComm and Boston Ventures acquired *MetroRED* shares in the 2000 Reorganization.[112] That is, by its own allega-

---

108. Am. Compl. ¶ 100.

109. 6 *Del. C.* § 18–804(d) provides:
Unless otherwise agreed, a member who receives a distribution from a limited liability company to which this section applies shall have no liability under this chapter or other applicable law for the amount of the distribution after the expiration of 3 years from the date of the distribution unless an action to recover the distribution from such member is commenced prior to the expiration of the said 3–year period and an adjudication of liability against such member is made in the said action.

110. Metro filed its original complaint on December 26, 2002.

111. *See* Am. Compl. ¶¶ 55, 98.

112. *Id.* ¶ 56. I note that this allegation is particularly difficult to comprehend, because it appears that in the 2000 Reorganization it was Metro that received a 10.4% interest in MetroRED in exchange for its 8% interest in Fidelity Brazil. That is, Metro's ownership stake in the underlying assets apparently increased, and MobileComm and Boston Ventures received nothing from either MetroRED or Fidelity Brazil. I do not rest my conclusion on this ground, however, because Metro has in any event failed to allege that Boston Ventures or MobileComm received any distribution of Fidelity Ventures' assets in the 2000 Reorganization.

tions, Metro concedes that MobileComm and Boston Ventures never received any distribution of Fidelity Brazil's assets, and thus any derivative claim against them brought on Fidelity Brazil's behalf under § 18–804(c) must be dismissed.[113]

■ By contrast, I will not dismiss the § 18–804(c) derivative claim against MetroRED. Assuming the truth of the pled facts, MetroRED was aware that Metro might have a claim against Fidelity Brazil based on the LLC Agreement (i.e., Metro was a "creditor" of Fidelity Brazil[114]), but MetroRED nonetheless received in connection with the 2000 Reorganization a distribution of all of Fidelity Brazil's assets and Fidelity Brazil was dissolved without first making reasonable provision for the payment of that claim. Thus, MetroRED may potentially be required to restore to Fidelity Brazil the distributions it received in 2000 to satisfy any judgment that Metro might ultimately obtain against Fidelity Brazil.

I now address Metro's claim under the Fraudulent Transfers Act. That claim is based on 6 *Del. C.* § 1304(a)(1), which provides:

A transfer made or obligation incurred by a debtor is fraudulent as to a credi-

tor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:

(1) With actual intent to hinder, delay or defraud any creditor of the debtor[.] [115]

Again, the only way I can describe Metro's claim is to use its own words:

In accordance with § 1304(a) of the Act, [Metro] has alleged that [Fidelity Brazil], [MobileComm] and [Boston Ventures] caused [Fidelity Brazil's] assets to be transferred to MetroRED and entered [Fidelity Brazil] into dissolution with the intent to hinder, delay and defraud creditors of [Fidelity Brazil], that MetroRED, which was controlled by [MobileComm] and [Boston Ventures], acted with knowledge of the fraudulent transfer, and that [Metro] is a creditor of [Fidelity Brazil]. [Metro] also alleges that [MobileComm] and [Boston Ventures] received shares of MetroRED.[116]

■ Metro simply fails to explain how it was "hinder[ed], delay[ed] and defraud[ed]" by the 2000 Reorganization – a Reorganization in which it participated. Presumably, Metro believes this to be the

---

**113.** Because I dismiss the § 18–804(c) claim against MobileComm and Boston Ventures on these grounds, I do not reach their argument that only members, and not "former members" can be liable under that subsection. Nor do I decide whether they were in fact "former members" at the time of the distributions, i.e., whether they successfully transferred their membership interests to MetroRED in the 1998 Reorganization.

**114.** The LLC Act does not define the term "creditor" or "claim." *See* 6 *Del. C.* § 18–101 (defining various terms for purposes of LLC Act). For purposes of this motion, I accept the parties' suggestion that the relevant definitions are analogous to those provided in 6 *Del. C.* § 1301 of the Fraudulent

Transfers Act, which states that " 'Creditor' means a person who has a claim," *id.* § 1301(4), and that " 'Claim' means a right to payment, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, *contingent,* matured, *unmatured, disputed,* undisputed, legal, equitable, secured or unsecured," *id.* § 1301(3) (emphasis added).

**115.** 6 *Del. C.* § 1304(a)(1). In its brief, Metro has explicitly chosen to rely on § 1304(a)(1), which requires Metro to prove that the defendant acted with "actual intent to hinder, delay or defraud" it, and does not purport to allege a claim under § 1304(a)(2).

**116.** Pl.'s Ans. Br. in Opp. to Defs.' Mot. to Dismiss, at 32 (citations omitted).

case because Fidelity Brazil was a Delaware LLC, while MetroRED, to which Fidelity Brazil's assets were transferred, is a Bermuda entity that (as of the 2000 Reorganization) might have been more difficult to sue in a convenient forum. Indeed, MetroRED initially moved to dismiss the complaint against it for lack of personal jurisdiction, a motion that it later withdrew.

In theory, I suppose that it is possible to imagine a viable claim under § 1304(a)(1) that alleges that a potential defendant-entity intentionally attempted to avoid liability on a claim by transferring all its assets and liabilities to another entity whose domicile would effectively insulate it from suit on behalf of the transferor-entity's creditors. But that is not this case. Metro has not pled facts that suggest that the 2000 Reorganization was motivated by "actual intent" of this kind, which is what § 1304(a)(1) requires. Moreover, MetroRED has submitted to jurisdiction in this court, alleviating any potential concerns about the sheltering of assets "offshore." The transfer of Fidelity Brazil's assets to MetroRED therefore cannot support a fraudulent conveyance claim.

Moreover, I am baffled by the suggestion that MobileComm and Boston Ventures were recipients of a fraudulent conveyance from Fidelity Brazil because they received shares of MetroRED in exchange for their Fidelity Brazil membership interests at some point. Metro provides no explanation of how this would "hinder, delay or defraud" it, as Metro never had any legitimate claim to MobileComm and Boston Venture's MetroRED shares, Fidelity Brazil was not a party to those transactions, and the fact that those shares are now held by MobileComm and Boston Ventures in no way impedes Metro from satisfying any judgment it might potentially receive out of MetroRED's underlying assets or the assets of some other defendant. The fact that certain MetroRED shares were issued at some time therefore also cannot support a fraudulent conveyance claim. Metro's claim under § 1304(a)(1) is dismissed.

### Metro's Derivative Claim For Consequential Damages Is Dismissed Without Prejudice For Noncompliance With Rule 23.1 And 6 Del. C. § 18–1003

Finally, I address Metro's claim for "consequential damages, including business opportunities lost as a result of defendants' misconduct, believed to exceed $95 million." [117] The defendants' argue that this claim for damages is derivative in nature and must be pled in accordance with the requirements of Court of Chancery Rule 23.1 and 6 *Del. C.* § 18–1003. [118] That is a correct argument but does not take this claim out of the case. Like its LLC Act claim, Metro did not plead its fiduciary duty claims as derivative even though some of them clearly are derivative in nature. Because, as has been noted, the complaint does nonetheless state grounds for demand excusal, it is more efficient to simply regard this claim as being derivative in nature and to require Metro to clean up the complaint.

The reason I reject Metro's argument that this damages claim is direct in nature is straightforward. Any harm that Metro suffered in this regard, such as lost potential profits from the scuttled IPO, is entirely contingent on harm suffered by Fidelity

---

117. Am. Compl. at 35.

118. 6 *Del. C.* § 18–1003 provides that "[i]n a derivative action, the complaint shall set forth with particularity the effort, if any, of the plaintiff to secure initiation of the action by a manager or member or the reasons for not making the effort."

Brazil as a whole as a result of alleged mismanagement. Metro's contention that this claim is a direct one because it seeks contractual "expectation damages" arising from Metro's initial decision to enter into the LLC Agreement cannot be accepted. If it were, then every equity investor would be able to transform derivative claims alleging harm to the business into direct claims merely by casting them as contractual claims based on the original agreement by which the investor purchased its equity interest.

Metro's complaint seeks damages for lost profits because the bribery scheme deprived Fidelity Brazil of the possibility of going public. Distilled down, its theory is that the bribery scheme destroyed the economic value of Fidelity Brazil, preventing it from being a viable enough company to go public. Thus, the injury that Metro alleges is, in the first instance, an injury to Fidelity Brazil itself and is therefore derivative in nature.[119] This does not mean that the damages theory that Metro articulates has no possible legal salience. As a derivative plaintiff, Metro may claim that Fidelity Brazil would have been worth a certain value had the defendants not breached their fiduciary duties and seek damages to Fidelity Brazil based on that diminution in value. The demand inquiry as to that diminution might well be informed by evidence regarding the IPO value of comparable firms.

### III. *Conclusion*

For the foregoing reasons, the defendants' motion to dismiss is granted in part, and denied in part. Given the unwieldiness of the complaint, the parties shall work together on an implementing order that clarifies the claims that remain in the case and those that have been dismissed. In addition, the parties shall confer and see whether they can agree to a cleaned-up amended complaint that permits Metro to proceed with derivative claims on behalf of Fidelity Brazil under Rule 23.1 and 6 *Del. C.* § 18–1003 and that provides better guidance as to the claims that remain in the case. The implementing order shall be submitted within twenty days.

---

**119.** *See Tooley v. Donaldson, Lufkin & Jenrette, Inc.,* 845 A.2d 1031, 2004 WL 728354 (Del. Apr.2, 2004).